# FL-04301

# *Hao, Bin - Vol. I.20230110.427581-MBO*

### *1/10/2023 9:00 AM*

**Condensed Transcript**

**Prepared by:**

FL-04301

Thursday, January 29, 2026

**Exhibit 1**

Page 1

THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION

In the Matter of:  )

  ) File No. FL-04301-A

QIDIAN, LLC  )

WITNESS:  Bin Hao

PAGES:   1 through 69

PLACE:   Securities and Exchange Commission

  801 Brickell Avenue

  Miami, Florida 33131

DATE:   Tuesday, January 10, 2023

The above-entitled matter came on for hearing via

Webex, pursuant to notice, at 9:00 a.m.

Diversified Reporting Services, Inc.

  (202)467-9200

Page 3

C O N T E N T S

WITNESS                    EXAMINATION

Bin Hao                          10

EXHIBITS:   DESCRIPTION                    IDENTIFIED

1       SEC Form 1662              8

2       Subpoena                8

3       Webpage                28

4       Affidavit from translation service    30

5       Offering materials          31

6       Translated offering materials      31

7       Investor package            34

8       Email                37

9       Email                39

10      Email                43

11      Bank statement              48

12      Bank statement              52

13      Bank statement              62

14      Bank statement              63

Page 2

APPEARANCES:

On behalf of the Securities and Exchange Commission:

  PAUL HOPKER, ESQ.

  Senior Counsel

  JASON R. BERKOWITZ, ESQ.

  Assistant Director

  Securities and Exchange Commission

  Division of Enforcement

  801 Brickell Avenue

  Miami, Florida  33131

  (305) 416-6295

On behalf of the Witness:

  JAMES T. BACON, ESQ.

  Mahdavi, Bacon, Halfhill & Young, PLLC

  11350 Random Hills Road, #700

  Fairfax, Virginia  22030

  (703) 420-7620

Page 4

P R O C E E D I N G S

MR. HOPKER:  So we're on the record at 9 a.m. on January 10, 2023.  Now, Mr. Hao, you were subpoenaed to provide in-person sworn testimony.  However, due to the guidelines and restrictions on travel pursuant to the current national health emergency we've converted your sworn in-person testimony to telephonic testimony via Webex.  Like a transcript of in-person testimony, your transcript may be used for all the routine uses set forth in what I will show you as Exhibit 1 but was previously provided to your counsel.

Do you consent to taking an oath or affirmation to tell the truth remotely via Webex rather than in person?

MR. HAO:  Yes.

MR. HOPKER:  Okay.  Instead of handing you paper exhibits I will also be showing you the exhibits over the Webex screen, so please take whatever time you need to review the exhibits on the screen.  Also, Mr. Hao, the exhibits I show you are confidential materials in this investigation and the property of the Commission.  Do not take a screenshot, photograph or otherwise copy or preserve the images of the exhibits or documents I share with you today.  Do you understand?

MR. HAO:  Yes.

Page 5

MR. HOPKER:  Okay.  Just to confirm, besides yourself and your attorney there's no one else in the room present with you, correct?  I'm sorry.  I didn't hear you, Mr. Hao.

MR. HAO:  Yes.  Nobody else except me and Jim.

MR. HOPKER:  Gotcha.  Okay.  And please during the testimony don't access or look at any documents other than those that I show you on the Webex screen.  Okay.  Can I have you raise your right hand for me, please?

MR. HAO:  Yes.

MR. HOPKER:  Okay.  Do you swear or affirm to tell the truth, the whole truth and nothing but the truth?  I'm sorry.  I didn't hear you.

MR. HAO:  Yes.

MR. HOPKER:  Okay.  Great.

Whereupon,

BIN HAO

was called as a witness and, having been first duly sworn, was examined and testified as follows:

MR. HOPKER:  I'm Paul Hopker, and I'm here with Jason Berkowitz, and we're officers of the Commission for purposes of this proceeding.  This is an investigation by the United States Securities & Exchange Commission, "In the Matter of Qidian, LLC," to determine

Page 6

whether there have been violations of certain provisions of the federal securities laws.  However, the facts developed in this investigation may constitute violations of other federal or state civil or criminal laws.

Can you please state your full name, and spell your last name and state your age for the record, please.

THE WITNESS:  Yes.  My first name Bin, B-i-n.  My last name is Hao spelled as H-a-o.

MR. HOPKER:  And your age, sir?

THE WITNESS:  My age is 51 years old.

MR. HOPKER:  Okay.  Great.  Now, I previously provided your counsel with a copy of the Formal Order, but I'm going to put it on the screen here right now if you want to take a look at it as is your right.  Can you see the document, sir?

THE WITNESS:  Barely.

MR. BACON:  You need to enlarge it or put it on your other screen like you did yesterday.

MR. HOPKER:  That's exactly what I was going to ask if you needed that.  How about now?  Is it better now?

MR. BACON:  Much better.

THE WITNESS:  Yeah.

Page 7

MR. HOPKER:  Gotcha.  Do you want a moment to look this over, sir?

MR. BACON:  I don't think so.  He's reviewed it.

MR. HOPKER:  Okay.  Then I'm going to stop sharing it.

MR. BERKOWITZ:  Jim and Mr. Hao, good morning.  Two technical points.  The first is that you also have the ability on your screen to enlarge I believe at the top.  If you click on -- there's a zoom in and zoom out feature, and so you can do that on your end as well.  Also, question, where's the microphone that you all are using?  Because it's a little unclear at times.  The speech is broken up.

MR. BACON:  The microphone is in the walls and ceiling.  We've never had a problem in five years doing depositions around the world including China.  I don't know why we can't hear you very well or why you can't hear us very well, but we will try to talk up as loudly as possible.

MR. BERKOWITZ:  So you just fixed it.  So speaking clearly and maybe a little bit more loudly has helped.  Thank you.

MR. HOPKER:  Okay.  Continuing on, Mr. Hao, prior to the opening of the record you were provided

Page 8

with a copy of the Commission's Supplemental Information Form.  A copy of that notice is now going to be put on the screen here, and it's marked as Exhibit 1.

(SEC Exhibit No. 1 was referred to.)

MR. HOPKER:  Now, you have previously been provided with this, but please if you want an opportunity to look it over and you have any questions concerning it just let me know.

MR. BACON:  There are no questions about Exhibit 1.

MR. HOPKER:  Okay.  Mr. Hao, you are here pursuant to a subpoena; is that correct?

THE WITNESS:  Yes.

MR. HOPKER:  I'm going to share pre-marked Exhibit 2.

(SEC Exhibit No. 2 was referred to.)

MR. HOPKER:  It should be on your screen now.  Is this the subpoena that you are appearing here pursuant to?

THE WITNESS:  I think so.

MR. HOPKER:  Okay.  Now, I provided your counsel with a background questionnaire.  I have not received the background questionnaire back, so I am going to go over a few questions about your background, sir.  Before I do that I just want to give you a few

Page 9

ground rules of how this testimony is going to proceed.

I'm going to ask you a question or a series of questions, and please do your best to try to answer them as fully as possible. The court reporter is going to take down the answers, but one thing I would ask is that you please let me ask the entire question before you start the answer so the court reporter can take down a clear record, and we're not talking over each other. If I ask a question, and you're not clear what I'm asking, I'll do my best to rephrase to make sure you and I are on the same page.

Also, if you need to take a break at any time to get coffee, water or go to the bathroom, please let me know, but please also recognize that only the staff of the Commission request authorize the court reporter to go off the record. If we do go off the record, any conversations of substance that we have off the record will have to be summarized when we get back on the record.

And also, when you answer please give a verbal answer as opposed to nodding your head or making a sign with your hands because the court reporter cannot take that down into the record. If you have during the course of the testimony any further information you want to supplement a previous answer with that's fine. At

Page 10

the end of the testimony, I'll give you an opportunity -- I will give your attorney an opportunity to ask any follow-up questions or clarify any questions that you guys may feel is necessary.

Do you have any questions about what I just explained to you?

THE WITNESS: No.

MR. HOPKER: Okay. Are you currently taking any medication or under the influence of any substance that would prevent you from testifying truthfully today?

THE WITNESS: No.

MR. HOPKER: Okay. Is there any mental or physical reason which would affect your ability to testify accurately today?

THE WITNESS: No.

EXAMINATION

BY MR. HOPKER:

Q   Mr. Hao, who is aware that you are here at this testimony today besides, obviously, your counsel?

A   Can you say that again, please?

Q   Who is aware that you are here at this testimony today?

A   Who is aware?

MR. BACON: Mr. Hao is going to invoke his Fifth Amendment right to remain silent on that question.

Page 11

MR. HOPKER: Okay. Mr. Hao, I'm not authorized to compel you to give evidence or testimony as to which you assert your privilege against self-incrimination and have no intention of doing so. In addition, I do not have the authority to compel your testimony by granting you immunity from prosecution. Any question that I ask hereafter will be with the understanding that if you wish to assert your privilege you need merely state that you refuse to answer on the grounds that your answer might incriminate you.

In other words, you are not compelled to answer any further questions that you believe that a truthful answer to the question might show that you committed a crime, and you wish to assert your privilege against self-incrimination. Accordingly, if you answer any questions, you will be doing so voluntarily.

Do you understand?

MR. BACON: He understands.

MR. HOPKER: You should be aware that if you refuse to answer a question based on --

MR. BERKOWITZ: I'm sorry, Paul. Counsel, I appreciate it, but it's the witness's privilege, so the witness needs --

MR. BACON: Yeah. I'm asserting it on his behalf, which is my right --

Page 12

MR. BERKOWITZ: Counsel, it is the witness's --

MR. BACON: -- as his counsel.

MR. BERKOWITZ: Okay.

MR. BACON: No. The witness does not have to assert the privilege, sir. Counsel asserts it for the witness.

MR. BERKOWITZ: And under what rules are you citing?

MR. BACON: Supreme Court.

MR. BERKOWITZ: Which Supreme Court case?

MR. BACON: I'm not here to debate with you. I'm here to represent my client at these questions. So please continue with your questions.

MR. BERKOWITZ: Understood, Counsel. But you're not sworn in, and it's the witness's privilege. So the witness can answer, "Fifth," or, "Fifth Amendment," but if the witness is not responding then we don't have a response.

MR. BACON: He is not going to say, "Fifth Amendment" every time. I've done this a thousand times with the SEC in D.C., and every time they permit counsel to assert the witness's Fifth Amendment right. So I don't understand where you're going. He's not going to say it. I'm going to say it.

Page 13

MR. BERKOWITZ: Sir, I hear what you're saying to me. That may or may not be your practice with others at the SEC. I can tell you in my 21 years of practicing with the SEC in all the testimonies and depositions that we've done the witness has to respond.

MR. BACON: In all my 40-plus years, I have never had the witness respond. I've always responded for the witness, and the SEC has no problem with that. So I don't know why -- do have you a rule or do have you a case that you can cite me that says that I cannot assert his right?

MR. BERKOWITZ: You are not sworn in, sir.

MR. BACON: That's not a role, nor is it a case. He is telling you -- and I will ask this one time. Please confirm that every time I assert your Fifth Amendment rights you have authorized me to do so in this case.

THE WITNESS: Yes.

MR. BACON: There you go. All right. What's the next question?

MR. BERKOWITZ: Just so you're aware, sir, that we may have to consider all options with regard to having your client assert the Fifth with responses to these questions.

MR. BACON: I think he just answered the

Page 14

question under oath that I posed to him that make it very, very clear. Please ask a question.

MR. BERKOWITZ: Go ahead, Paul. You may continue.

MR. HOPKER: Okay. Mr. Hao, you should be aware that if you refuse to answer a question based on your Fifth Amendment privilege a judge or jury may take an adverse inference against you in a civil action that the SEC may determine to bring against you. That means that the judge or jury would be permitted to infer that your answer to the questions might incriminate you. Do you understand?

THE WITNESS: Yes.

MR. HOPKER: Okay.

BY MR. HOPKER:

Q   Mr. Hao, what is the address that you currently reside at?

A   13008 Cabin Creek Road. The city name is Herndon. State is in Virginia. Zip code is 20171.

Q   Did you say Cabin Creek Road? I'm sorry. You just broke up momentarily.

A   Cabin, C-a-b-i- n.

MR. BACON: The address on your letters.

MR. HOPKER: Gotcha. Okay. Thank you.

BY MR. HOPKER:

Page 15

Q   And can you please list your current cell phone and any business or home phone numbers that you have?

A   Our cell phone is (571) 723-6889.

Q   Is that your only phone number, sir?

A   Yes.

Q   Okay. And would you please list any websites that you currently have or have established or control the content of?

A   We used to have website, Qidian's website. It's called qidiancapitals.com.

Q   And could you spell or tell me what the address was for that website?

A   Yeah. It's www.qidiancapitals.com.

Q   Okay. And is that website still currently active, sir?

A   I don't think so. I think it was -- I think it was hosted by Amazon web service, and it has expired. And this one is in the -- is a Chinese version, and there's also English version that's called ww.qdcrowd, c-r-o-w-d,.com.

Q   Okay. And is that -- the Chinese version still active?

A   No.

Q   Okay. And do you know when these websites

Page 16

went inactive, sir?

A   I don't know exactly when, but last time I was trying to access both sites it was -- it was not successful.

Q   Okay. And when was that that you last tried to access them?

A   Don't remember exact date. Sometime last year.

Q   Okay. Late last year or the middle of the year? Do you remember when?

A   Sometime mid last year. I called my web service people, and they said they were going to make a few changes, like secure coding changes, and it was off for, like, a few days, and it disappeared again.

Q   Okay. And that was in -- that's sometime in mid-2022?

A   Sometime last year. I don't really remember the exact date.

Q   Okay. And could you please list for me your various email addresses?

A   My business email address is bhao@tdncapital.com. My personal email address is y_bhao@yahoo.com.

Q   And those are your only two email addresses, sir?

Page 17

A   I have a couple other email addresses.

Q   Okay.  And what are those email addresses?

A   There's another one bhao001@gmail.com.  And there's another one is bhao2005@hotmail.com.

Q   Okay.  Any others?

A   No others.

Q   Okay.  Thank you.  Could you briefly summarize your educational history starting from high school to your most recent degree that you actually received?

A   I group up in Beijing, China.  My high school is the Beijing No. 5 High School.  I came to this country in 1996.  I attend Temple University studying civil engineering, a master degree for about three months, and then I transferred to University of Maryland College Park and study aerospace engineering, and I got master's degree back in 1997.  And my next degree was from the University of Virginia Business School from 2002 through 2004.

Q   Okay.  So you got a degree in aerospace engineering from the University of Maryland and then a degree, a master's degree in business, did you say, from the University of Virginia?

A   M.B.A.

Q   Yeah.  Okay.  Do you hold now or have you ever held any professional licenses?

Page 18

A   I hold a real estate license, real estate broker license.

Q   Okay.  In what state, sir?

A   In Virginia.

Q   Is that still active?

A   I think it's inactive right now.

Q   Okay.  And when did you obtain your real estate license?

A   First I attend the real estate -- it's an agent license, and then three years later I got the broker license.  I think it was about five years ago, six years ago.

Q   Okay.  And when did it go inactive?

A   I think December last year.

Q   Okay.  And is that the only professional license that you held?  Well, you said you also had a real estate agent license, but besides those two licenses have you held any other professional licenses?

A   I used to have the (audio drop) license when I was working in a hedge fund.  That was back about 15 years ago.  I think is a Series 3.

Q   Okay.  So you had a license from FINRA when you worked for a hedge fund?

A   Yeah, NFA, National Futures Association.

Q   Okay.  And you think it was a Series 3?

Page 19

A   I think so, yeah.  It was back 15, 20 years ago.

Q   Okay.  And what did you -- well, how long did you have your Series 3 license?

A   Well, about three to five years.

Q   Okay.  And when did that become inactive?

A   When I left the firm in 2014.

Q   Okay.  So you said you worked for a hedge fund.  Have you ever been an employee of any broker/dealer, investment advisor or investment company?

A   The firm I was working for the name was called PJM Capital, and it was CPA.  It was a CPA firm.  And then I think back in 2013 they applied for RIA license.  RIA stands for -- I forgot what it stands for.  It's RIA license, and (audio drop 21:27) in2014.

Q   Okay.  So you said it was PJM Capital that you worked for?

A   Yeah, P as Peter, J as Jag, M as Mary Capital.

Q   And they applied for a registered investment advisor license sometime in 2014, you believe?

A   2012 or 2013.

Q   Okay.

A   It's a full license, yeah.

Q   And when did you leave the employ of PJM Capital?

Page 20

A   I left in June 2014.

Q   Okay.  And what did you do for PJM Capital?

A   Originally, I was a system engineer.  I do technology for them.  And then I was trained as a trader, and then for the next five to six years I was their director of trading and execution.

Q   Okay.  When you were the director of trading and execution, what did that entail?

A   We were trading global commodity futures.

Q   Okay.  So is that what PJM Capital specialized in, trading global commodities futures?

A   Yes.

Q   Mr. Hao, who is your current employer?

A   I don't have a current employer.  I just -- I lost my job December 20 last year.

Q   Okay.  Who is your previous employer that was employing you prior to December 20th?

A   It's called JVM Homes.  J as Jack, V as Victor, M as Mary Homes.

Q   Okay.  And what business are they in?

A   They are a developer in real estate.

Q   A real estate developer.  Okay.  And where are they located?

A   They are located in Vienna, Virginia.

Q   I'm sorry.  You broke up.  Where in Virginia

Page 21

are they located?

A   Vienna.  Tyson's Corner Vienna.

Q   Okay.  Gotcha.  Vienna.  And what was your title for that company?

A   I was the vice president.

Q   Okay.  And what were your job duties there?

A   I was -- couple of them.  Number one was looking for the resources, looking for the architect forums, engineer forums and talk to those people.  Second is do certain working with the real estate agent to locate good resources.

Q   And how long did you work for that company, sir?

A   I started on July 1st until December 20.

Q   Okay.  And what was your salary at that company?

A   Making $10,000 per month.

Q   Okay.  And what was your employment prior to working at that company?

A   I was the CEO and president of Qidian, LLC.

Q   Okay.  Is Qidian, LLC still an active corporation?

A   It is still active.

Q   Okay.  And are you still the CEO of Qidian, LLC?

Page 22

A   That is still active, but there was no business.  We were affected by a bunch of developers and (audio drop 25:39) and not well.

Q   Okay.  So the company still has a legal existence, but it has no business right now?

A   No business for about a year and a half.

Q   Okay.  But are you still the CEO and president of Qidian?

MR. BACON:  Mr. Hao is going to invoke his Fifth Amendment right to remain silent.

MR. HOPKER:  Okay.

BY MR. HOPKER:

Q   Mr. Hao, can you estimate what your yearly income has been for the last three years?

MR. BACON:  Mr. Hao is going to invoke his Fifth Amendment right to remain silent.

BY MR. HOPKER:

Q   Mr. Hao, are you currently married?

A   No.

Q   Okay.  Have you ever been married in the recent past?

A   I was -- I got divorced in 2019.

Q   Okay.  And how long were you married?

A   Well, 2019 minus -- 23 years.

Q   Okay.

Page 23

A   Approximately.

Q   Gotcha.  Are you currently a member of any professional organizations?

A   I'm not.

Q   You are not.  Okay.  Have you been a member of any professional organizations in the last three years?

A   I think when I was the real estate agent I was the member of the Northern Virginia Real Estate -- I don't remember.  There's a Northern Virginia, and I pay the membership fees, but I don't remember exact their names.

Q   Okay.  So you were a member of a real estate -- professional organization for real estate agents in Northern Virginia?

A   Something like that, yes.

Q   Okay.  And do you remember approximately how long you were a member of that organization?

A   Approximately five to six years.

Q   Okay.  And do you remember about when you ceased to be a member of that organization?

A   I don't remember.

Q   Okay.  Mr. Hao, you've briefly touched on it, but could you please tell me what Qidian, LLC is and what its business is?

A   Qidian, LLC started in 2015.  It's a startup

Page 24

business, and we were focusing on facilitating regional developers to generate more funding resource for their small multifamily programs.

Q   Okay.  So you said you focused on small developers did you say, finding funding for small developers?

A   For the developers, regional developers.

Q   Okay.  And in what form did that funding take?

A   It's normally taking in the position as a mezzanine loan, and Qidian is forming something called SPV, Special Purpose Vehicle, as the lender to the developers' entities.

Q   Okay.  So you would provide mezzanine loan financing to developers?

A   Yes.  Yes, as a mezzanine.

Q   And you would create Special Purpose Vehicles to provide that mezzanine financing?

A   Yes.

Q   Okay.  What kind of interest rates did you charge the developers?

A   It's different from different developers.  Sometime some developers it's about 12 percent.  The highest goes to 20 percent.

Q   And how did you evaluate what interest rate you would charge developers for mezzanine financing?

Page 25

A    We take their due diligence package.  We look at the land value and look at the appraisal, and we also look at the developer's track record and background.

Q    And how many different developers did Qidian provide mezzanine financing to?

MR. BACON:  Mr. Hao is going to invoke his Fifth Amendment right to remain silent.

MR. HOPKER:  Okay.

BY MR. HOPKER:

Q    About how many projects did you provide mezzanine financing to?

MR. BACON:  Mr. Hao is going to invoke his Fifth Amendment right to remain silent.

BY MR. HOPKER:

Q    How many employees does Qidian have or did have working on its behalf?

MR. BACON:  Mr. Hao invokes his Fifth Amendment right.

MR. BERKOWITZ:  And I will make an objection on the record for the past three responses that Mr. Hao did not provide --

MR. BACON:  I will again make it clear. Mr. Hao, have you instructed me to make your Fifth Amendment objections?

THE WITNESS:  Yes.

Page 26

MR. BACON:  Okay.  That's the second time I think we've said that under oath.

MR. BERKOWITZ:  I appreciate that, Counsel. Paul, let's take a five-minute break and go off the record.

MR. HOPKER:  Okay.  We're off the record at 9:33 a.m.  We'll go back on the record at 9:40.  How does that sound?

MR. BERKOWITZ:  That works.

(A brief recess was taken.)

MR. HOPKER:  We're back on the record at 9:41 a.m. on January 10, 2023.  Mr. Hao, did we have any discussions of substance while we were off the record?

THE WITNESS:  Say again, please.

MR. HOPKER:  Did we have any discussions of substance while we were off the record with you?

MR. BACON:  When you say, "Did we," are you asking yourself --

MR. HOPKER:  No, no.  Yes.  I'm asking did myself or Jason Berkowitz have any discussions with you while we were off the record.

MR. BACON:  Just so you understand, English is not Mr. Hao's first language.  He's very literal, and sometimes you need to be real clear.

MR. HOPKER:  I understand.  Okay.

Page 27

MR. BACON:  Do you understand that question?

THE WITNESS:  So I didn't talk to you or the other attorney off the record, no.

MR. HOPKER:  Okay.  Good.  Thank you.

THE WITNESS:  Is that what you meant?

MR. HOPKER:  That is what I meant.  And if we go offer the record, I will ask that every time we get back on the record just so it's preserved on the record.

BY MR. HOPKER:

Q    Before we went off the record, Mr. Hao, I was asking about Qidian, LLC.  So I have a few more questions for you about Qidian.  What services did you offer clients through Qidian?

A    I'm going to use my right for the Fifth Amendment.

MR. HOPKER:  Okay.  You can just say, "Take Five," or, "Fifth Amendment" if that's what you're going to do.

THE WITNESS:  Oh, "Fifth Amendment."  Okay. Can I just say, "Fifth" instead of "Fifth Amendment"?

MR. HOPKER:  Yes.  That works.  Okay.

BY MR. HOPKER:

Q    And when did you start offering services to clients through Qidian?

A    Fifth.

Page 28

Q    Okay.  And do you still offer services to clients through Qidian?

A    Fifth.

Q    And how many clients do you have through Qidian?

A    Fifth.

Q    If I continue to ask you questions about clients and services that Qidian provides, will you continue to assert your Fifth Amendment privilege?

A    Yes.

Q    Okay.  Earlier you spoke about a website that Qidian had.  When did the website become active?

A    Fifth.

MR. HOPKER:  Okay.  I'm going to show you a couple of documents here.  I should say one document. Okay.  The document should appear on your screen now, and I'm going to mark this as Exhibit 3.

(SEC Exhibit No. 3 was marked for identification.)

BY MR. HOPKER:

Q    Do you see that document, sir?

A    Yes.

Q    Does that look familiar to you?

A    Fifth.

Q    And is this a copy of two pages of your web

Page 29

page, the Qidian, LLC web page?

A   Fifth.

Q   If I can turn your attention to page 2 on this document, the highlighted section specifically, it says, "Agreements with developers." Could you please read the highlighted portions for me?

A   Fifth.

Q   Okay. Do the highlighted sections say, "Agreements with developers, completion guarantee, pledges security UCC filing"?

A   Fifth.

Q   And then up above say, "QD is involved in monitoring and reporting with the developer"?

A   Fifth.

Q   Did Qidian make UCC filings with its investments with Metronomics?

A   Fifth.

Q   Did Qidian actually monitor and look at reports from Metronomics, from its investments with Metronomics?

A   Fifth.

Q   What guarantees, filings and monitoring were in place with the Metronomic investments?

A   Fifth.

Q   If I continue to ask you questions about this

Page 30

website and the disclosures made on it, will you continue to assert your Fifth Amendment privilege?

A   Yes.

MR. HOPKER:  Okay. I'm going to stop sharing that. Bear with me one second here. Okay. I'm going to show you another document, sir. Actually, this is going to be a series of documents, so give me one second. Okay. I'm going to show you a document that I've marked as Exhibit 4.

(SEC Exhibit No. 4 was marked for identification.)

MR. HOPKER:

Q   Do you see that document, sir?

A   Yes.

MR. BACON:  Hold on. Okay.

BY MR. HOPKER:

Q   Okay. This is an affidavit from a translation service that the Commission has employed to translate certain documents. Do you see that?

A   Yes.

Q   Okay. This is in support of the next two exhibits; namely, their translation services were used for the document that I'm about to show you that I'm going to mark Exhibit 5. Do you understand?

A   Yes.

Page 31

MR. HOPKER:  Okay.

(SEC Exhibit No. 5 was marked for identification.)

MR. HOPKER:

Q   Do you see this document which I'm currently marking as Exhibit 5?

A   I can see it.

Q   I'm sorry. Can you see it?

A   Yes, I can see it.

Q   Okay. And is this a copy of offering materials that you offered investors in Qidian that is in Chinese?

A   Fifth.

MR. HOPKER:  Okay. I am now going to show you another document which I'm going to mark Exhibit 6.

(SEC Exhibit No. 6 was marked for identification.)

BY MR. HOPKER:

Q   Can you see that document, sir?

A   Yes, I can.

Q   Okay. And is this the offering materials that I just showed you that were in Chinese translated into English?

A   Yes. I can see it.

Q   Okay. And is that the same document only

Page 32

translated from Chinese into English?

A   Fifth.

Q   Okay. If can I direct you to the highlighted portion where it says, "Legal contracts," can you read the highlighted portion for me?

A   "Legal contracts principal guarantee and return guarantee. Investor will own 100 percent of the project prior to successful exit secured by to mature asset of the developer, 8 percent annualized for return. Project completion time (audio drop 41:36) guarantee, joint and several guarantee."

Q   Okay. And is this information that you provided to investors in Qidian's offerings?

A   Fifth.

Q   Did you tell investors that their investments were guaranteed, and they would own the projects prior to completion?

A   Fifth.

Q   Was it actually true that they would own -- that they owned the project prior to a successful exit?

A   Fifth.

Q   If I keep asking you questions about these offering materials that you gave to Qidian investors, will you continue to assert your Fifth Amendment privilege?

Page 33

A   Yes.

MR. HOPKER:  Thank you.

MR. BACON:  I just want to know separately will I be receiving copies of these exhibits that you're using or no?

MR. HOPKER:  We do not provide copies of the exhibits.  You can get a copy of the transcript but not the exhibits themselves.

MR. BERKOWITZ:  Counsel, Paul is correct that you will not be -- your client will not be provided with copies.  If you are requesting the opportunity to review it in person, we can make arrangements for that.

MR. BACON:  Can I take pictures?

MR. BERKOWITZ:  No.  Unfortunately, we're not permitted here to allow photos, or anything like that, but we can -- we have done it two ways.  One is electronically where we can set up a time where you can actually review it through this Webex on a computer so it's easier for you to review.  Even then you're not permitted to take photos.  The other option is to send it to, you know, the nearest SEC office, and you can review it in person then.

MR. BACON:  If we can do that by Webex, I'd be happy to do that in the next few weeks.

MR. BERKOWITZ:  Sure.  And we can schedule it.

Page 34

We can get a paralegal or work with your office and get that set up.

MR. BACON:  That's fine, yeah.

MR. HOPKER:  Okay.  I'm going to press ahead by showing you a couple more exhibits here, sir.  Bear with me.  The network is taking a while to open the document.

BY MR. HOPKER:

Q   Okay.  I have just shared another document.  Can you see that document, sir?

A   Yes.

MR. HOPKER:  Okay.  I'm going to have this -- I'm marking this an Exhibit 7, I believe.  Yes.

(SEC Exhibit No. 7 was marked for identification.)

BY MR. HOPKER:

Q   Okay.  Is this a copy of one of the offerings that you made to Qidian investors?

A   Fifth.

Q   I'm going to scroll down to the bottom.  Okay.  Now on page 36 of the document is this the signature of the investor Dian Zhou and your signature also on the document, sir?

A   Fifth.

Q   Okay.  Now going up to page 2, if I can have

Page 35

you read the highlighted portion of page 2 for me, please.

A   "Management fee zero percent."

Q   Okay.  I believe there's actually text to the left of that as well.

A   "Management fees and incentive."

Q   Okay.  So it says, "Management fees and incentive.  Management fee zero percent," and then on page 3 the two highlighted portions as well, please.

A   "The management fee is waived for this offer.  Management fee zero dollar."

Q   Okay.  So is this -- I guess I already asked you this question, but for the highlighted portions did you tell investors that the management fee for this offering was zero dollars, that Qidian would not take a management fee?

A   Fifth.

Q   And did you also say that there was no incentive for Qidian in this offering?

A   Fifth.

Q   I'm sorry.  Bear with me one second.  Okay.  And if I could direct you to page 13 the top of the page.  If you could read what I'm now highlighting.

MR. BACON:  Let me just note an objection.  A deposition is to answer questions, not to read to

Page 36

people.  And we're going to object to reading.  The document speaks for itself.  Asking him to read it is improper.

MR. HOPKER:  Okay.

BY MR. HOPKER:

Q   Does the top of page 13 say, "Subscription agreement for units of membership interest in QDE 18, LLC"?

A   Fifth.

Q   Is this what you offered investors in Qidian offerings, units of membership interest in the various Special Purpose Vehicles?

A   Fifth.

Q   And did Qidian actually manage the investments of these SPVs for the SPVs?

A   Fifth.

Q   And who controlled both the investment entity and Qidian during this time?  Yourself?

A   Fifth.

Q   Did the Special Purpose Vehicles and Qidian keep up corporate formalities between themselves such as different boards or keeping separate minutes of the boards?

A   Fifth.

Q   I'm sorry.  I didn't hear you.

Page 37

A   Fifth.

Q   The Fifth?  Okay.  If I continue asking you questions about the unit membership interests of the Special Purpose Vehicles and the control of the investment entities by Qidian, will you continue to assert your Fifth Amendment privilege?

A   Yes.

Q   Again that was a little quiet.  If you could just speak up in the future.  I think you said yes?

A   Yes.

Q   Gotcha.  Okay.  And if I continue to ask about the disclosures in your promissory note about management fees and incentives, will you continue to assert your Fifth Amendment privilege?

A   Yes.

MR. HOPKER:  Okay.  Thank you.  Okay.  I'm going to share another document with you, sir.

BY MR. HOPKER:

Q   Can you see that document?

MR. BACON:  Yes.  I think we can see it now.

MR. HOPKER:  Okay.  I'm going to mark this as Exhibit 8.

(SEC Exhibit No. 8 was marked for identification.)

BY MR. HOPKER:

Page 38

Q   Can you tell me what this document is, sir?

A   Fifth.

Q   Okay.  Is this an email that you sent to Ricky Trinidad on July 23, 2019?

A   Fifth.

Q   Okay.  And in the highlighted portion that I have below, did Ricky Trinidad say to you in the email on July 23, 2019 "In the recent text, you mentioned that you raised substantial capital for Metronomics, and you ask what we have done for you.  My answer is that you personally earned and received over $3 million in fees from our work.  You will continue earning good fees from us for years to come, and your investors will make good interest from our projects."  Did you earn $3 million in fees from your work with Metronomics?

A   Fifth.

Q   Who paid the $3 million in fees to you?

A   Fifth.

Q   Was the payment of fees by Metronomics or anyone else ever disclosed to Qidian investors?

A   Fifth.

Q   If I continue to ask you questions about this email and the earning of the $3 million in fees mentioned in it, will you continue to assert your Fifth Amendment privilege?

Page 39

A   Yes.

MR. HOPKER:  Okay.  I'm going to share a couple more documents with you, sir.  Okay.  This should be -- you should see a document now which I am marking Exhibit 9.

(SEC Exhibit No. 9 was marked for identification.)

BY MR. HOPKER:

Q   Do you see that document, sir?

MR. BACON:  Wait a minute.  Scroll up a little bit, please.

MR. HOPKER:  I've scrolled to the top already.

MR. BACON:  Okay.  It's cut off at the bottom.

MR. HOPKER:  You should be able to control the scrolling, but if you can't just let me know, and I can scroll down for you.

MR. BACON:  I cannot scroll.  I'm trying since the beginning of this deposition.  I can enlarge.  It's tough, but your colleague showed me how to do that.  But unfortunately, I cannot scroll.  If you're looking -- can you see my arrow trying to scroll?

MR. HOPKER:  Yeah.  Unfortunately, it doesn't work like that.  Just let me know if you want me to scroll down at any time, and I can do that.  Do you want me to scroll down so you can take a look at the complete

Page 40

document?

MR. BACON:  I'd like to scroll.  Are you saying I can't --

MR. BERKOWITZ:  Yeah.  So Paul, let me see -- I see on my screen on the top right there's a little screen button that says, "Ask to control."  I don't know if that's on your end.

MR. BACON:  I don't have that, but that's fine.  I don't want to waste any more time.

MR. BERKOWITZ:  Do you see the squiggly line?

MR. BACON:  Yes.

MR. BERKOWITZ:  Next to that one?

MR. BACON:  Right here.

MR. BERKOWITZ:  Next to that one do you see that screen that says, "Ask to control" if you hover over it?  Try that.  And Paul, do you get a heads-up that he's asking to control?

MR. HOPKER:  I have not received anything, no.

MR. BACON:  That's all right.  It's not worth the time wasted on it.  I think we've seen it.  You can ask a question.

MR. HOPKER:  Okay.  Again, at any time when I show you documents in the future since it doesn't look like you have the ability to scroll, just let me know, and I can scroll the document for you.

Page 41

MR. BACON:  Thank you.

MR. HOPKER:  Okay.

BY MR. HOPKER:

Q   Mr. Hao, can you tell me what this document is?

A   I can't see it.

MR. BACON:  Let me enlarge it.

BY MR. HOPKER:

Q   Let me ask you a more pointed question.  Is this an email from Ricky Trinidad to you on June 3, 2019?

A   Fifth.

Q   Okay.  And in the first paragraph which I have highlighted here, did Mr. Trinidad say to you, "As we close the recapitalization we will replace your mezz position with preferred equity lender."

A   Fifth.

Q   And then down below in the second paragraph the highlighted portion did he say to you, "You mentioned that you would reduce your fees for the Qidian Miami projects because we're bringing investors and facilitating space.  Let me know how you believe you should structure those deals.  In addition to Grand Plaza we can raise much more capital in Miami with this collaboration.  It's a good idea to start it with Grand

Page 42

Plaza because it's a sexy project with a lot of appeal and visibility that everyone in Miami will know about."

MR. BACON:  Please scroll down, please.  I'm unable to see that.  There we go.  Thank you.

BY MR. HOPKER:

Q   Did Mr. Trinidad say that to you in an email?

A   Fifth.

Q   And was this Grand Plaza project being discussed in this email the same project that we looked at the promissory note for in the previous -- or in Exhibit 7, I believe?

A   Fifth.

Q   Okay.  Did you restructure or change your fees for the Grand Plaza project?

A   Fifth.

Q   And was it this time in June 2019 Metronomics already running into financial problems thus the wanting to recapitalize and replace their mezzanine financing with preferred equity lenders?

A   Fifth.

Q   Were you aware that Metronomics was already having financial problems in June of 2019?

A   Fifth.

Q   And had Metronomics ceased paying interest on the mezzanine financing provided by Qidian by June 2019?

Page 43

A   Fifth.

Q   I'm sorry.  You cut off there for a second.

A   Oh, Fifth.

Q   Okay.  Thank you.  If I continue to ask you questions about this email, will you continue to assert your Fifth Amendment privilege?

A   Yes.

MR. HOPKER:  Okay.  Now I'm going to show you another document that I have queued up already.  Okay.  You should see another document already.

MR. BACON:  Exhibit 10?

MR. HOPKER:  This will be marked Exhibit 10.  That's exactly right.

(SEC Exhibit No. 10 was marked for identification.)

BY MR. HOPKER:

Q   It is now marked as Exhibit 10.  Do you see this document, sir?

A   Yes.

Q   Is this another email from Ricky Trinidad to you but dated July 17, 2019?

A   Fifth.

Q   I'm scrolling down now.  You should see a highlighted portion which I believe is the fifth paragraph of this email.  Do you see the highlighted

Page 44

portion, sir?

A   Yes, I can see it.

Q   Okay.  Good.  Thank you.  Now, the highlighted portion says, "Regarding the marketing fee of 40,000," or 40K, "we didn't agree on this before raising the funds, and we simply don't have the 40,000 to send you.  My understanding was that all interest and fees were being paid as balloon payments upon completion.  After closing, you told me that we owed 40,000 in marketing fees that we had to pay cash.  Since then I've been trying to figure out how to pay you this 40,000 and from where.  Normally, we fund interest and fees upfront.

"If I had known you were going to charge us cash, I would have insisted on raising enough to cover these fees.  In fact, you did raise enough, but it was returned.  We should have peeled out 40,000 from there for your fees.  We simply don't have it especially now when we're putting all efforts to refinance the entire portfolio with new income from draws at the moment" -- I'm sorry, "no income from draws at the moment."  So is this highlighted portion of the email about a $40,000 fee you were charging Metronomics for bringing in investors?

A   Fifth.

Q   Was it related to the Grand Plaza project that

Page 45

we saw in Exhibit 7 and was mentioned in the previous Exhibit 8 and 9?

A   Fifth.

Q   Did Metronomics pay this $40,000 eventually?

A   Fifth.

Q   Did the subscription agreement we looked at in Exhibit 7 say there was no incentive or management fee?

A   Fifth.

Q   Is the statement in Exhibit 7 that there was no management or incentive fee in conflict with this email that says that there was a $40,000 marketing fee that you were charging Metronomics?

A   Fifth.

Q   Were investors told of this $40,000 marketing fee and who would pay it?

A   Fifth.

Q   If I continue to answer -- I'm sorry.  If I continue to ask you questions about Exhibit 10 and this email, will you continue to assert your Fifth Amendment privilege?

A   Yes.

MR. HOPKER:  Okay.  Thank you.

MR. BERKOWITZ:  Maybe this is a good time to take a five-minute break?

MR. HOPKER:  Sure.  We're off the record at

Page 46

5:12 a.m., and we'll go back on the record at -- did I say 5:12?  I meant 10:12.  And we'll go back on at 10:17.

MR. BERKOWITZ:  Unless Counsel or Mr. Hao if you'd like a little bit longer.

MR. BACON:  That's fine.  We're just trying to get an understanding of how long we're going to go today.

MR. BERKOWITZ:  What do you think, Paul, if you had to ballpark it.

MR. HOPKER:  I wouldn't say more than a couple more hours at most.  Literally, I would say an hour and a half tops.

MR. BACON:  Okay.  Thanks.  We'll be back at 12:17 -- I mean --

MR. HOPKER:  Okay.  Why don't we make it 12:18 because a minute has elapsed.

MR. BACON:  All right.  That's fine.  We can just round it off to 10:20.

MR. HOPKER:  Okay.  Why don't we do 10:20.  Okay.  We're off the record at 10:13.  Thank you.

(A brief recess was taken.)

MR. HOPKER:  Okay.  So if everyone's ready, we are back on the record at 10:22 a.m. on January 10, 2023.  Mr. Hao, did Jason Berkowitz or myself have any

Page 47

conversations of substance with you while we were off the record?

THE WITNESS:  No.

MR. HOPKER:  Okay.  Thank you.

BY MR. HOPKER:

Q   Okay.  Getting back to the line of questioning I was asking you just before we went off the record, when did Metronomics stop paying Qidian, LLC its interest payments?

A   Fifth.

Q   Were you still taking investment money even after Metronomics had ceased making interest payments?

A   Fifth.

Q   Did you disclose to investors that Metronomics had ceased making investment payments?

A   Say it again, please.

Q   Did you disclose to investors that Metronomics had ceased making interest payments?

A   Fifth.

Q   Were interest payments still being made to Qidian investors even after Metronomics stopped paying interest?

A   Fifth.

Q   Where did the money for interest payments come from if Metronomics had ceased paying interest payments?

Page 48

A   Fifth.

MR. HOPKER:  I am going to show you another series of documents, sir.

BY MR. HOPKER:

Q   Okay.  You should see a document on your screen right now that is a Bank of America bank statement.  Do you see that?

A   Yes.

Q   Do you recognize this bank account?

A   Yes.

Q   Was this bank statement provided as part of the records that we subpoenaed both yourself and Qidian, LLC?  I'm sorry.  I didn't hear you.

A   Fifth.

Q   You're taking Five on if you provided this document to us?

A   Fifth.

Q   Okay.  So is this the bank statement for Qidian, LLC's Bank of America account ending in 2279 for September of 2019?

A   Fifth.

MR. HOPKER:  I'm going to mark this as Exhibit 11, I believe.  Yup, Exhibit 11.

(SEC Exhibit No. 11 was marked for identification.)

Page 49

BY MR. HOPKER:

Q   And I'm going to jump to page 3 of this document. Can you see that certain transactions are highlighted on this document, sir?  I'm sorry.  I couldn't hear you.

A   Oh, okay.  I can see.

Q   Okay.  Yeah.  I'm just going to briefly summarize the three -- the highlighted transactions because reading each one individually would take forever.  Were there two deposits on the 16th and 18th of September in the amount of 25,000 each from Duke Corporation?

A   Fifth.

Q   And is Duke Corporation an investor in Qidian, LLC Investments?

A   Fifth.

Q   And is there another investment that was deposited -- or I should say -- I'm sorry.  Was there $117,863 deposited on September 27, 2019 by -- that originated in Hong Kong that was another investment -- or another deposit from an investor in Qidian, LLC offering?

A   Fifth.

Q   And was there a series of transactions that went out on September 19, 2019, September 20, 2019 and

Page 50

September 24, 2019 in amounts between $500 and $2,700 to various investors in Qidian, LLC offerings?

A   Fifth.

Q   And were those interest payments for previous investments by investors in Qidian, LLC offerings?

A   Fifth.

Q   And was the source of money for those interest payments the investor deposits that were deposited from September 16th through September 27, 2019 as I mentioned above?

A   Fifth.

Q   Okay.  I've now scrolled to page 4, and there's another continuing set of transactions that are highlighted from the 24th through the 26th in amounts between $500 and $4,000.  Again are these interest payments to previous Qidian, LLC investors?

A   Fifth.

Q   And are these -- or were these interest payments made with investor money as mentioned above that was deposited from the 16th through the 27th of September in the account?

A   Fifth.

Q   Okay.  And the last two transactions on September 30, 2019 for $25,000 each were these again payments to previous Qidian investors?

Page 51

A   Fifth.

Q   And was the source of money to make these payments the investor money that was deposited from the 16th through the 27th of September 2019 that was mentioned above?

A   Fifth.

Q   Okay.  Thank you, sir.  If I continue to ask you questions about this September 2019 bank statement, will you continue to assert your Fifth Amendment privilege?

A   Yes.

Q   Okay.  Just one more question about this.  Did you tell investors that you would pay interest to old investors with new investor money?

A   Fifth.

Q   Okay.  Were you -- or I should say are you in control of and the only authorized user of Qidian, LLC's Bank of America account ending in 2279?

A   Fifth.

Q   Did anyone else have access to or use the account besides yourself?

A   Fifth.

Q   Did you make and/or authorize all the transactions made in this account?

A   Fifth.

Page 52

MR. HOPKER:  Bear with me for one second. Okay.  I'm going to share another document with you, sir.

BY MR. HOPKER:

Q   Can you see that document?

A   Yes.

MR. HOPKER:  Okay.  I'm marking this as Exhibit 12.

(SEC Exhibit No. 12 was marked for identification.)

BY MR. HOPKER:

Q   Okay.  And again was this a bank statement that was provided by yourself pursuant to the subpoena that I sent you on November 21, 2022 both to yourself and Qidian, LLC?

A   Fifth.

Q   I'm sorry.  What?  You want me to scroll down?

A   Yeah.  Please scroll down.

Q   Okay.  Let me zoom out just a little bit. Tell me if it's too small, but then I can also scroll down.  Do you need me to continue to scroll?

A   That's fine.

MR. HOPKER:  Just let me know when you're ready, and I'll ask you questions about this.

THE WITNESS:  Can you scroll up?  Thanks.

Page 53

Down a little bit.  Okay.

BY MR. HOPKER:

Q   Okay.  Were you in control of and are you the authorized user of this Qidian, LLC Capital One bank account ending in 4453?

A   Fifth.

Q   Did anyone else have access to or use the account besides yourself?

A   Fifth.

Q   Did you make and/or authorize all the transactions in this account?

A   Fifth.

Q   Okay.  If I can point your attention to these two highlighted transactions here, is the first transaction from October 3, 2019 from an Aiping Li for $100,000, a deposit by an investor in Qidian, LLC offering?

A   Fifth.

Q   And was this after Metronomics had ceased paying interest payments to Qidian, LLC?

A   Fifth.

Q   And is this highlighted withdrawal from October 4, 2019 a withdrawal that you made in the same amount of $100,000?

A   Can you please scroll down?  Fifth.

Page 54

Q   Okay.  And was the source of funds for this $100,000 withdrawal the previous highlighted deposit of $100,000 on October 3rd?

A   Fifth.

Q   And did you tell the investor that you would withdraw this money immediately upon them depositing it?

A   Fifth.

Q   Okay.  I'm going to direct you now to page 4. Can you see page 4, sir?

A   Yes.

Q   And do you see the -- I can scroll down a little bit.  Do you see these two highlighted transactions here at the bottom of page 4?

A   Can you scroll down a little bit more?

Q   Yeah.

A   Yes.

Q   Okay.  And can I direct you to the first highlighted entry that was made on October 30, 2019?  It was a deposit in the amount of $117,848.59.  Do you see that?  I'm sorry.  I didn't hear you.

A   Yes, I can see it.

Q   Okay.  Okay.  Thank you.  And is that another deposit by an investor in a Qidian offering?

A   Fifth.

Q   Okay.  And if I can direct your attention to

Page 55

the far right where -- here, I'll scroll up just so you can see it.  The far right is a category saying Resulting Balance.  So it's a running balance of the amount in the account, and on that date the 117,000 -- put the amount currently in the account at $144,867; is that correct?

A   Fifth.

Q   And the very next transaction on October 31st is an international wire that was sent to a -- it says Dr. HK Hong -- I'm sorry for butchering this name -- Hongzhishengy.  Again, this is simply what the international wire information says.  But it was an international wire sent out in the amount of $67,808. Did you authorize this transaction, this international wire transfer the day after the customer deposit?

A   Fifth.

Q   And did you tell the investor who invested $117,000 that you would send 67,000 of it overseas the next day?

A   Fifth.

Q   Okay.  And you can see the running total has been reduced to $77,059 after that withdrawal.  Did you see that?

A   Fifth.

Q   Okay.  And if I can direct you now to page 7,

Page 56

there's a series of highlighted transactions.  Can you see -- well, can you see page 7 in general?

A   I can only see the top.

Q   Okay.  How about now?

A   Better.

Q   Okay.  And this is the same bank account ending in 4453 only it's the November 19th account statement.  Is that correct?

A   Fifth.

Q   And this bank statement was also provided by you pursuant to the subpoena that I sent to both yourself and Qidian, LLC on November 21, 2023, correct? I'm sorry.  November 21, 2022.

A   Fifth.

Q   Okay.  If I can direct your attention to the series of highlighted transactions, they're all withdrawals between the date of November 1st and November 7th.  The first withdrawal is $1,800 that was used for according to the notation payroll at Qidian, and this reduced the balance to $71,998.  So if you remember from the previous account statement that is money that was left over from the $117,000 investor deposit.  Did Qidian pay its payroll with investor money that was deposited on October 30, 2019?

A   Fifth.

Page 57

Q   And then the next two transactions on the 5th of November appear to be $25,000 withdrawals to previous Qidian investors.  Did Qidian pay back those two investors with investor money that was deposited on October 30, 2019?

A   Fifth.

Q   And then the next withdrawal of $632 was to the IRS.  Did Qidian pay its taxes with investor money that was invested -- or sent to Qidian on October 30, 2019?

A   Fifth.

Q   And then again there's three transactions bearing between $1,000 and $1,800 that appear to be interest payments or other forms of payment to previous Qidian investors.  Were those amounts paid with the investor deposit on October 30, 2019?

A   Fifth.

Q   Thank you.  And I have now scrolled to page 9, and there's two more highlighted, transactions.  Can you see those two highlighted transactions, sir?

A   Yes, I can.

Q   Okay.  On November 7, 2019, did you pay $387 to the Qidian AmEx using the investor money that was deposited on October 30, 2019?

A   Fifth.

Page 58

Q   And then this final transaction that's highlighted from November 12, 2019 in the amount of $1,201.56 the notation says, "Mortgage 111219 Hao."  Did you pay your mortgage with investor money that was deposited on October 30, 2019?

A   Fifth.

Q   As you can see, the resulting balance at the end of that time period is $15,346.14.  And if you remember from October, the running balance was originally $177,000 after the $117,000 deposit.  Was the all but $15,000 of the money that was deposited in the account used per the transactions we just went over?

A   Fifth.

Q   Okay.  If I continue to ask questions about the October/November 2019 account statements for Qidian's Capital One account ending in 4453, will you continue to assert your Fifth Amendment privilege?

A   Yes.

Q   One more question.  Did you inform your investors that you would pay your mortgage with investor money?

A   Fifth.

MR. HOPKER:  Give me one second.  Okay.  If you'd just bear with me, sir, I only have two more documents I need to show you and a series of questions

Page 59

related on them.  So hopefully we can wrap this up in the next 30 minutes if that's amenable to you guys.  I'm going to share another document with you.

BY MR. HOPKER:

Q   Okay.  The document should be shared.  Do you see that document, sir?

A   Yes.

Q   Okay.  And does this appear to be a bank statement from Capital One for QDEF 16, LLC that ends in 2471?

A   Fifth.

Q   Is this a bank statement that was provided to the Commission pursuant to the subpoena that I sent you and Qidian, LLC on November 21, 2022?

A   Fifth.

Q   Did you have control of this bank account, the QDEF 16, LLC bank account from Capital One ending in 2471 -- did only yourself have access and/or use this account during the time in question?

A   Fifth.

Q   Did you make and/or authorize all transactions in this account?

A   Fifth.

Q   Is QDEF 16, LLC a Special Purpose Vehicle for one of the investments that Qidian made in Metronomics

Page 60

or other developer's property?

A   Fifth.

Q   If I can direct your attention to the highlighted transactions from the beginning of December 2019 -- I'm sorry, 2018, the first highlighted transaction is from December 6, 2018.  It's a wire transfer from Washington One Capital Co. in the amount of $1.5 million.  Do you see that, sir?

A   Fifth.

Q   Okay.  And then there was another transaction on November -- I'm sorry, December 11, 2018 in the amount of $100,000 from Leping Jia Walla Cewayne.  Again I am very sorry for my terrible pronunciation I'm sure which is not accurate, but a deposit in the amount of $100,000 on December 11th?

A   Fifth.

Q   Can I direct your attention to a international wire out made on that same day, December 11th in the amount of $1.5 million to a Dr. Chen Wenhui?  Was that --

A   Fifth.

Q   I'm sorry.  Who is Dr. Chen Wenhui?

A   Fifth.

Q   And why did you send him $1.5 million on December 11, 2018?

Page 61

A  Fifth.

Q  What was the source of that $1.5 million?  Was it the two investor deposits that I mentioned above for 1.5 million and $100,000 on December 6th and December 11th respectively?

A  Fifth.

Q  Did you tell either of those investors or any other investors that you would send their money to Dr. Chen Wenhui overseas before they invested?

A  Fifth.

Q  Okay.  If I can direct your attention now page 5 of this document, can you see page 5, sir?

A  Yes, I can.

Q  Okay.  And again is this a copy of a bank statement from May of 2019 for the same QDEF 16, LLC entity ending in 2471 at Capital One?

A  Fifth.

Q  And was this bank statement also provided by yourself pursuant to the subpoena that I sent yourself and Qidian on November 21, 2022?

A  Fifth.

Q  Okay.  If I can direct your attention to the two highlighted transactions, again this is a deposit made on May 17, 2019 by Droplet Holdings, Limited in the amount of $1.5 million.  Was that a deposit from an

Page 62

investor or investors in a Qidian offering?

A  Fifth.

Q  And then on May 20, 2019, there was another international wire transfer out in the amount of half a million dollars to Dr. Chen Wenhui.  Did you authorize that half a million dollar withdrawal?

A  Fifth.

Q  Did you tell any investor in Droplet Holdings or any other Qidian offering that you would send money overseas to Dr. Chen Wenhui or anyone else before they made their investment?

A  Fifth.

Q  If I continue to ask you questions about the QDEF 16, LLC bank account at Capital One that ends in 2471, will you continue to assert your Fifth Amendment privilege?

A  Yes.

MR. HOPKER:  Okay.  Thank you.  I'm sorry.  I have to reshare that.  I just realized I never marked the exhibit.  So resharing the same document which is the QDEF 16 Capital One Bank account that ends in 2471 from the period of December 2018 and then again statements from May of 2019 I'm marking as Exhibit 13.

(SEC Exhibit No. 13 was marked for identification.)

Page 63

MR. HOPKER:  Okay.  Okay.  If you can just bear with me, I just have one more document to show you, sir.

BY MR. HOPKER:

Q  Okay.  Do you see this document, sir?

A  Yes.

MR. HOPKER:  Okay.  Let me know if you need me to scroll, but I'm marking this as Exhibit 14.

(SEC Exhibit No. 14 was marked for identification.)

BY MR. HOPKER:

Q  I've now marked it as Exhibit 14.  Is this a bank statement that was provided by you pursuant to the subpoena to yourself and Qidian, LLC on November 21, 2022, and is it the bank statements for August 2019 for QDD 14, LLC, a Capital One account ending in 4607?

A  Fifth.

Q  Is QDD 14, LLC a Special Purpose Vehicle created by Qidian for one of its investments -- I'm sorry -- yes, one of its investments in a developer's property?

A  Fifth.

Q  And did you offer unit memberships in the Special Purpose Vehicle QDD 14 to investors?

A  Fifth.

Page 64

Q  If I can direct you to the first highlighted transaction here, it's from August 5, 2019.  It appears to be an ACH deposit by J&H Investments in the amount of $300,000.

Is that a deposit by a Qidian investor in this QDD 14 Special Purpose Vehicle?

A  Fifth.

Q  If I can direct you to the two wires out that were made on August 5, 2019 and August 14, 2019, one in the amount of $58,000 to Dr. Muxuan Gao and another international wire transfer to Dr. Cheng Xue Hong, the August 5th one in the amount of $58,000 and the August 14th one in the amount of $174,955, why were these two wires sent to two doctors overseas?

A  Fifth.

Q  And was the source of the money for these two international wires the investor deposit on August 5, 2019?

A  Fifth.

Q  And was this after Metronomics and other real estate developers had ceased paying interest payments to Qidian, LLC?

A  Fifth.

Q  And did you inform the investor who deposited the $300,000 on August 5, 2019 that you would send

Page 65

approximately $225,000 of their investment overseas within ten days of their investment?

A   Fifth.

Q   Who are Dr. Muxuan Gao and Dr. Cheng Xue Hong?

A   Fifth.

Q   If I continue to ask you questions about the QDD 14 Capital One account ending in 4607, will you continue to assert your Fifth Amendment privilege?

A   Yes.

Q   Okay. Mr. Hao, is there anything else you would like to tell me about Qidian Special Purpose Vehicles and its use of funds by investors?

A   Fifth.

MR. HOPKER:  Well, Mr. Hao, I do not have any other questions for you at this time.

Do you or your counsel wish to clarify anything or add anything to the record based on what I've asked you today?

THE WITNESS:  Fifth.

MR. HOPKER:  Counsel, do you wish to ask any clarifying questions?

MR. BACON:  No.  This is a deposition, right?

MR. HOPKER:  Well, on-the-record testimony. It's a little different than a deposition, but yes.

MR. BACON:  If it's a deposition, he would

Page 66

like to read it.

MR. HOPKER:  A copy of the testimony?

MR. BACON:  Well, are you going to ask -- is he going to sign this like a normal deposition?  Is that the idea?

MR. HOPKER:  No.  This is an on-the-record testimony.  He doesn't sign it like a deposition.

MR. BACON:  Okay.

MR. HOPKER:  But if you want -- I'll send you an order form, and then you can order a copy of the testimony.

And certainly if you think there's misspellings, or something like that, can you, you know, contact the court reporter for correction.

MR. BACON:  Well, I won't know whether there's misspellings, and Mr. Hao won't know unless we have a copy to look at.

MR. HOPKER:  Right.

That's what I'm saying.  I'll send you the order form so you'll be able to order it, or you can review the -- once it's been completed, you'll be able to review a copy of it.

MR. BACON:  Okay.  We'll wait until it's completed.  Then we'll review a copy of it.

MR. HOPKER:  Okay.

Page 67

MR. BACON:  The only other thing is to ask you to provide me with some dates so that I can see the exhibits on Webex.

MR. HOPKER:  Yeah.  I will do that.  Contact me and tell me what dates would work best for you, and I'm sure we can work around your schedule because I'll just get a paralegal or my support staff to make it available.

MR. BACON:  Okay.  Will do.  That's it then. Thank you.

MR. HOPKER:  Okay.  Mr. Hao, I have no further questions at this time.

However, we may call you again to testify in this investigation.  Should it be necessary, I'll contact your counsel to schedule any possible future testimony.  We are off the record at 10:56 a.m. on January 10, 2023.

(Whereupon, at 10:56 a.m. the examination was concluded.)

* * * * *

Page 68

PROOFREADER'S CERTIFICATE

In the Matter of:  QIDIAN, LLC

Witness:       Bin Hao

File No.        FL-04301-A

Date:          Tuesday, January 10, 2023

Location:      Miami, Florida

This is to certify that I, Christine Boyce, (the undersigned), do hereby certify that the foregoing transcript is a complete, true and accurate transcription of all matters contained on the recorded proceedings of the investigative testimony.

_____        _____

(Proofreader's Name)          1-19-2023

Page 69

REPORTER'S CERTIFICATE

I, Sonia Gonzalez, reporter, hereby certify that the foregoing transcript is a complete, true, and accurate transcript of the testimony indicated, held on January 10, 2023, in the matter of QIDIAN, LLC.

I further certify that this proceeding was recorded by me, and the foregoing transcript has been prepared under my direction.

1-19-2023

# Transcript Word Index

**[& - 40k]**

## &

**&**
2:17 5:24

## 0

**04301**
1:4 68:5

## 1

**1**
1:8 3:8 4:10 8:3,4,10

**1,000**
57:13

**1,201.56**
58:3

**1,800**
56:18 57:13

**1.5**
60:8,19,24 61:2,4,25

**10**
1:12 3:4,17 4:3 26:12 43:11
43:12,14,17 45:18 46:24
67:17 68:6 69:6

**10,000**
21:17

**10:12**
46:2

**10:13**
46:21

**10:17**
46:3

**10:20**
46:19,20

**10:22**
46:24

**10:56**
67:16,18

**100**
32:7

**100,000**
53:16,24 54:2,3 60:12,15
61:4

**11**
3:18 48:23,23,24 60:11,25

**111219**
58:3

**11350**
2:18

**117,000**
55:4,18 56:22 58:10

**117,848.59.**
54:19

**117,863**
49:19

**1-19-2023**
68:17 69:11

**11th**
60:15,18 61:5

**12**
3:19 24:22 52:8,9 58:2

**12:17**
46:15

**12:18**
46:16

**13**
3:20 35:22 36:6 62:23,24

**13008**
14:18

**14**
3:21 63:8,9,12,16,18,24
64:6,9 65:7

**144,867**
55:5

**14th**
64:13

**15**
18:21 19:1

**15,000**
58:11

**15,346.14.**
58:8

**16**
59:9,17,24 61:15 62:14,21

**1662**
3:8

**16th**
49:10 50:9,20 51:4

**17**
43:21 61:24

**174,955**
64:13

**177,000**
58:10

**18**
36:7

**18th**
49:10

**19**
49:25

**1996**
17:12

**1997**
17:16

**19th**
56:7

**1st**
21:14 56:17

## 2

**2**
3:9 8:15,16 29:3 34:25 35:1

**2,700**
50:1

**20**
19:1 20:15 21:14 24:23
49:25 62:3

**2002**
17:18

**2004**
17:18

**2012**
19:21

**2013**
19:13,21

**2014**
19:7,20 20:1

**2015**
23:25

**20171**
14:19

**2018**
60:5,6,11,25 62:22

**2019**
22:22,24 38:4,8 41:11
42:16,22,25 43:21 48:20
49:19,25,25 50:1,9,24 51:4
51:8 53:15,23 54:18 56:24
57:5,10,16,22,24 58:2,5,15
60:5 61:15,24 62:3,23
63:15 64:2,9,9,18,25

**202**
1:25

**2022**
16:16 52:14 56:13 59:14
61:20 63:15

**2023**
1:12 4:3 26:12 46:25 56:12
67:17 68:6 69:6

**20th**
20:17

**21**
13:3 52:14 56:12,13 59:14
61:20 63:14

**21:27**
19:15

**22030**
2:19

**225,000**
65:1

**2279**
48:19 51:18

**23**
22:24 38:4,8

**24**
50:1

**2471**
59:10,18 61:16 62:15,21

**24th**
50:14

**25,000**
49:11 50:24 57:2

**25:39**
22:3

**26th**
50:14

**27**
49:19 50:9

**27th**
50:20 51:4

**28**
3:10

## 3

**3**
3:10 18:21,25 19:4 28:17
28:18 35:9 38:11,14,17,23
41:10 49:2 53:15

**30**
3:11 50:24 54:18 56:24
57:5,9,16,24 58:5 59:2

**300,000**
64:4,25

**305**
2:12

**31**
3:12,13

**31st**
55:8

**33131**
1:11 2:11

**34**
3:14

**36**
34:21

**37**
3:15

**387**
57:22

**39**
3:16

**3rd**
54:3

## 4

**4**
3:11 30:9,10 50:12 53:23
54:8,9,13

**4,000**
50:15

**40**
13:6

**40,000**
44:4,6,9,11,16,21 45:4,11
45:14

**40k**
44:5

**[41:36 - asserts]**

**41:36**
32:10
**416-6295**
2:12
**420-7620**
2:20
**43**
3:17
**4453**
53:5 56:7 58:16
**4607**
63:16 65:7
**467-9200**
1:25
**48**
3:18

**5**

**5**
3:12 17:11 30:24 31:2,6
61:12,12 64:2,9,17,25
**5:12**
46:1,2
**500**
50:1,15
**51**
6:12
**52**
3:19
**571**
15:4
**58,000**
64:10,12
**5th**
57:1 64:12

**6**

**6**
3:13 31:15,16 60:6
**62**
3:20
**63**
3:21
**632**
57:7
**67,000**
55:18
**67,808**
55:13
**69**
1:8
**6th**
61:4

**7**

**7**
3:14 34:13,14 42:11 45:1,7
45:9 55:25 56:2 57:22

**700**
2:18
**703**
2:20
**71,998**
56:20
**723-6889**
15:4
**77,059**
55:22
**7th**
56:18

**8**

**8**
3:8,9,15 32:9 37:22,23 45:2
**801**
1:10 2:10

**9**

**9**
3:16 4:2 39:5,6 45:2 57:18
**9:00**
1:15
**9:33**
26:7
**9:40**
26:7
**9:41**
26:11

**a**

**a.m.**
1:15 4:2 26:7,12 46:1,24
67:16,18
**ability**
7:9 10:13 40:24
**able**
39:14 66:20,21
**access**
5:7 16:3,6 51:20 53:7 59:18
**account**
48:9,19 50:21 51:18,21,24
53:5,8,11 55:4,5 56:6,7,21
58:12,15,16 59:16,17,19,22
62:14,21 63:16 65:7
**accurate**
60:14 68:11 69:5
**accurately**
10:14
**ach**
64:3
**action**
14:8
**active**
15:16,23 18:5 21:21,23
22:1 28:12

**add**
65:17
**addition**
11:5 41:23
**address**
14:16,23 15:13 16:21,22
**addresses**
16:20,24 17:1,2
**adverse**
14:8
**advisor**
19:10,20
**aerospace**
17:15,19
**affect**
10:13
**affidavit**
3:11 30:17
**affirm**
5:12
**affirmation**
4:13
**age**
6:7,11,12
**agent**
18:10,17 21:10 23:7
**agents**
23:13
**ago**
18:11,12,21 19:2
**agree**
44:5
**agreement**
36:7 45:6
**agreements**
29:5,9
**ahead**
14:3 34:4
**aiping**
53:15
**allow**
33:15
**amazon**
15:18
**amenable**
59:2
**amendment**
10:25 12:18,21,23 13:16
14:7 22:10,16 25:7,13,18
25:24 27:15,17,19,20 28:9
30:2 32:24 37:6,14 38:25
43:6 45:19 51:9 58:17
62:15 65:8
**america**
48:6,19 51:18

**amex**
57:23
**amount**
49:11 53:24 54:19 55:4,5
55:13 58:2 60:7,12,14,19
61:25 62:4 64:3,10,12,13
**amounts**
50:1,14 57:15
**annualized**
32:9
**answer**
9:3,7,20,21,25 11:9,10,12
11:13,15,20 12:17 14:6,11
35:25 38:10 45:17
**answered**
13:25
**answers**
9:5
**appeal**
42:1
**appear**
28:16 57:2,13 59:8
**appearances**
2:1
**appearing**
8:18
**appears**
64:2
**applied**
19:13,19
**appraisal**
25:2
**appreciate**
11:22 26:3
**approximately**
23:1,16,18 65:1
**architect**
21:8
**arrangements**
33:12
**arrow**
39:21
**asked**
35:12 65:18
**asking**
9:9 26:18,19 27:11 32:22
36:2 37:2 40:17 47:7
**assert**
11:3,8,14 12:6,23 13:11,15
13:23 28:9 30:2 32:24 37:6
37:13 38:24 43:5 45:19
51:9 58:17 62:15 65:8
**asserting**
11:24
**asserts**
12:6

[asset - coffee]

**asset**
32:9
**assistant**
2:7
**association**
18:24
**attend**
17:12 18:9
**attention**
29:3 53:13 54:25 56:15
60:3,17 61:11,22
**attorney**
5:2 10:2 27:3
**audio**
18:19 19:15 22:3 32:10
**august**
63:15 64:2,9,9,12,12,17,25
**authority**
11:5
**authorize**
9:15 51:23 53:10 55:14
59:21 62:5
**authorized**
11:2 13:16 51:17 53:4
**available**
67:8
**avenue**
1:10 2:10
**aware**
10:18,21,23 11:19 13:21
14:6 42:21

**b**

**back**
8:23 9:18 17:16 18:20 19:1
19:13 26:7,11 27:8 46:1,2
46:14,24 47:6 57:3
**background**
8:22,23,24 25:3
**bacon**
2:16,17 6:19,24 7:3,15 8:9
10:24 11:18,24 12:3,5,10
12:12,20 13:6,13,19,25
14:23 22:9,15 25:6,12,17
25:22 26:1,17,22 27:1
30:15 33:3,13,23 34:3
35:24 37:20 39:10,13,17
40:2,8,11,13,19 41:1,7 42:3
43:11 46:6,14,18 65:22,25
66:3,8,15,23 67:1,9
**balance**
55:3,3 56:20 58:7,9
**balloon**
44:8
**ballpark**
46:10

**bank**
3:18,19,20,21 48:6,6,9,11
48:18,19 51:8,18 52:12
53:4 56:6,10 59:8,12,16,17
61:14,18 62:14,21 63:13,15
**barely**
6:18
**based**
11:20 14:6 65:17
**bathroom**
9:13
**bear**
30:5 34:5 35:21 52:1 58:24
63:2
**bearing**
57:13
**beginning**
39:18 60:4
**behalf**
2:3,15 11:25 25:16
**beijing**
17:10,11
**believe**
7:9 11:12 19:20 34:13 35:4
41:22 42:11 43:24 48:23
**berkowitz**
2:6 5:22 7:7,21 11:21 12:1
12:4,8,11,15 13:1,12,21
14:3 25:19 26:3,9,20 33:9
33:14,25 40:4,10,12,14
45:23 46:4,9,25
**best**
9:3,10 67:5
**better**
6:22,24 56:5
**bhao**
16:22,23
**bhao001**
17:3
**bhao2005**
17:4
**bin**
1:7 3:4 5:18 6:9 68:4
**bit**
7:22 39:11 46:5 52:19 53:1
54:12,14
**boards**
36:22,23
**bottom**
34:20 39:13 54:13
**boyce**
68:9
**break**
9:12 26:4 45:24
**brickell**
1:10 2:10

**brief**
26:10 46:22
**briefly**
17:7 23:22 49:7
**bring**
14:9
**bringing**
41:21 44:22
**broke**
14:21 20:25
**broken**
7:14
**broker**
18:2,11 19:10
**bunch**
22:2
**business**
15:2 16:21 17:17,21 20:20
22:2,5,6 23:24 24:1
**butchering**
55:10
**button**
40:6

**c**

**cabin**
14:18,20,22
**call**
67:13
**called**
5:19 15:11,20 16:11 19:11
20:18 24:10
**capital**
19:12,16,18,25 20:2,10
38:9 41:24 53:4 58:16 59:9
59:17 60:7 61:16 62:14,21
63:16 65:7
**case**
12:11 13:10,14,17
**cash**
44:10,14
**category**
55:2
**ceased**
23:20 42:24 47:12,15,18,25
53:19 64:21
**ceiling**
7:16
**cell**
15:1,4
**ceo**
21:20,24 22:7
**certain**
6:1 21:10 30:19 49:3
**certainly**
66:12

**certificate**
68:1 69:1
**certify**
68:9,10 69:3,8
**cewayne**
60:12
**change**
42:13
**changes**
16:13,13
**charge**
24:20,25 44:13
**charging**
44:22 45:12
**chen**
60:19,22 61:9 62:5,10
**cheng**
64:11 65:4
**china**
7:17 17:10
**chinese**
15:19,22 31:12,22 32:1
**christine**
68:9
**cite**
13:10
**citing**
12:9
**city**
14:18
**civil**
6:4 14:8 17:13
**clarify**
10:3 65:16
**clarifying**
65:21
**clear**
9:8,9 14:2 25:22 26:24
**clearly**
7:22
**click**
7:10
**client**
12:13 13:23 33:10
**clients**
27:13,24 28:2,4,8
**close**
41:15
**closing**
44:9
**code**
14:19
**coding**
16:13
**coffee**
9:13

**[collaboration - document]**

collaboration
  41:25
colleague
  39:19
college
  17:15
com
  15:21
commission
  1:1,9 2:3,8 4:22 5:23,25
  9:15 30:18 59:13
commission's
  8:1
committed
  11:14
commodities
  20:11
commodity
  20:9
company
  19:10 21:4,12,16,19 22:4
compel
  11:2,5
compelled
  11:11
complete
  39:25 68:11 69:4
completed
  66:21,24
completion
  29:9 32:10,17 44:8
computer
  33:18
concerning
  8:8
concluded
  67:19
confidential
  4:20
confirm
  5:1 13:15
conflict
  45:10
consent
  4:12
consider
  13:22
constitute
  6:3
contact
  66:14 67:4,15
contained
  68:12
content
  15:9

continue
  12:14 14:4 28:7,9 29:25
  30:2 32:24 37:2,5,11,13
  38:12,22,24 43:4,5 45:17
  45:18,19 51:7,9 52:21
  58:14,17 62:13,15 65:6,8
continuing
  7:24 50:13
contracts
  32:4,6
control
  15:8 37:4 39:14 40:6,15,17
  51:17 53:3 59:16
controlled
  36:17
conversations
  9:17 47:1
converted
  4:6
copies
  33:4,6,11
copy
  4:23 6:14 8:1,2 28:25 31:10
  33:7 34:17 61:14 66:2,10
  66:17,22,24
corner
  21:2
corporate
  36:21
corporation
  21:22 49:12,14
correct
  5:3 8:12 33:9 55:6 56:8,12
correction
  66:14
counsel
  2:5 4:11 6:14 8:22 10:19
  11:21 12:1,3,6,15,22 26:3
  33:9 46:4 65:16,20 67:15
country
  17:12
couple
  17:1 21:7 28:15 34:5 39:3
  46:11
course
  9:24
court
  9:4,7,15,22 12:10,11 66:14
cover
  44:14
cpa
  19:12,12
create
  24:16
created
  63:19

creek
  14:18,20
crime
  11:14
criminal
  6:4
current
  4:6 15:1 20:13,14
currently
  10:8 14:17 15:8,15 22:18
  23:2 31:5 55:5
customer
  55:15
cut
  39:13 43:2

**d**

d.c.
  12:22
date
  1:12 16:7,18 55:4 56:17
  68:6
dated
  43:21
dates
  67:2,5
day
  55:15,19 60:18
days
  16:14 65:2
dealer
  19:10
deals
  41:23
debate
  12:12
december
  18:14 20:15,17 21:14 60:4
  60:6,11,15,18,25 61:4,4
  62:22
degree
  17:9,13,16,16,19,21,21
deposit
  49:21 53:16 54:2,19,23
  55:15 56:23 57:16 58:10
  60:14 61:23,25 64:3,5,17
deposited
  49:18,19 50:8,20 51:3
  56:24 57:4,24 58:5,11
  64:24
depositing
  54:6
deposition
  35:25 39:18 65:22,24,25
  66:4,7
depositions
  7:17 13:4

deposits
  49:10 50:8 61:3
description
  3:7
determine
  5:25 14:9
developed
  6:3
developer
  20:21,22 29:13 32:9
developers
  22:2 24:2,5,6,7,7,12,14,20
  24:21,22,25 25:4 29:5,9
  64:21
developer's
  25:3 60:1 63:20
dian
  34:22
didn't
  44:5
different
  24:21,21 25:4 36:22 65:24
diligence
  25:1
direct
  32:3 35:22 54:8,17,25
  55:25 56:15 60:3,17 61:11
  61:22 64:1,8
direction
  69:10
director
  2:7 20:6,7
disappeared
  16:14
disclose
  47:14,17
disclosed
  38:20
disclosures
  30:1 37:12
discussed
  42:9
discussions
  26:13,15,20
diversified
  1:24
division
  2:9
divorced
  22:22
doctors
  64:14
document
  6:17 28:15,16,21 29:4 30:6
  30:8,13,23 31:5,15,19,25
  34:7,9,10,21,23 36:2 37:17

[document - finra]

**document (cont.)**
37:19 38:1 39:4,9 40:1,25
41:4 43:9,10,18 48:5,16
49:3,4 52:2,5 59:3,5,6
61:12 62:20 63:2,5
**documents**
4:24 5:7 28:15 30:7,19 39:3
40:23 48:3 58:25
**doing**
7:16 11:4,16
**dollar**
35:11 62:6
**dollars**
35:15 62:5
**dr**
55:10 60:19,22 61:9 62:5
62:10 64:10,11 65:4,4
**draws**
44:19,20
**drop**
18:19 19:15 22:3 32:10
**droplet**
61:24 62:8
**due**
4:4 25:1
**duke**
49:11,14
**duly**
5:19
**duties**
21:6

**e**

**earlier**
28:11
**earn**
38:14
**earned**
38:11
**earning**
38:12,23
**easier**
33:19
**educational**
17:8
**efforts**
44:18
**either**
61:7
**elapsed**
46:17
**electronically**
33:17
**email**
3:15,16,17 16:20,21,22,24
17:1,2 38:3,7,23 41:10 42:6
42:9 43:5,20,25 44:21

**email (cont.)**
45:11,19
**emergency**
4:6
**employ**
19:24
**employed**
30:18
**employee**
19:9
**employees**
25:15
**employer**
20:13,14,16
**employing**
20:17
**employment**
21:18
**ends**
59:9 62:14,21
**enforcement**
2:9
**engineer**
20:3 21:9
**engineering**
17:13,15,20
**english**
15:20 26:22 31:23 32:1
**enlarge**
6:19 7:9 39:18 41:7
**entail**
20:8
**entire**
9:6 44:18
**entities**
24:12 37:5
**entitled**
1:14
**entity**
36:17 61:16
**entry**
54:18
**equity**
41:16 42:19
**especially**
44:17
**esq**
2:4,6,16
**established**
15:8
**estate**
18:1,1,8,9,17 20:21,22
21:10 23:7,8,12,13 64:21
**estimate**
22:13

**evaluate**
24:24
**eventually**
45:4
**everyone's**
46:23
**evidence**
11:2
**exact**
16:7,18 23:10
**exactly**
6:21 16:2 43:13
**examination**
3:3 10:16 67:18
**examined**
5:20
**exchange**
1:1,9 2:3,8 5:24
**execution**
20:6,8
**exhibit**
4:10 8:3,4,10,15,16 28:17
28:18 30:9,10,24 31:2,6,15
31:16 34:13,14 37:22,23
39:5,6 42:11 43:11,12,14
43:17 45:1,2,7,9,18 48:22
48:23,24 52:8,9 62:20,23
62:24 63:8,9,12
**exhibits**
3:7 4:17,17,19,20,23 30:22
33:4,7,8 34:5 67:3
**existence**
22:5
**exit**
32:8,20
**expired**
15:18
**explained**
10:6

**f**

**facilitating**
24:1 41:22
**fact**
44:15
**facts**
6:2
**fairfax**
2:19
**familiar**
28:23
**far**
55:1,2
**feature**
7:11
**federal**
6:2,4

**fee**
35:3,8,10,11,14,16 44:4,22
45:7,10,11,15
**feel**
10:4
**fees**
23:10 35:6,7 37:13 38:11
38:12,15,17,19,23 41:20
42:13 44:7,10,12,15,17
**fifth**
10:25 12:17,17,20,23 13:16
13:23 14:7 22:10,16 25:7
25:13,17,23 27:14,17,19,20
27:20,25 28:3,6,9,13,24
29:2,7,11,14,17,21,24 30:2
31:13 32:2,14,18,21,24
34:19,24 35:17,20 36:9,13
36:16,19,24 37:1,2,6,14
38:2,5,16,18,21,24 41:12
41:17 42:7,12,15,20,23
43:1,3,6,22,24 44:24 45:3,5
45:8,13,16,19 47:10,13,19
47:23 48:1,14,17,21 49:13
49:16,23 50:3,6,11,17,22
51:1,6,9,15,19,22,25 52:16
53:6,9,12,18,21,25 54:4,7
54:24 55:7,16,20,24 56:9
56:14,25 57:6,11,17,25
58:6,13,17,22 59:11,15,20
59:23 60:2,9,16,21,23 61:1
61:6,10,17,21 62:2,7,12,15
63:17,22,25 64:7,15,19,23
65:3,5,8,13,19
**figure**
44:11
**file**
1:4 68:5
**filing**
29:10
**filings**
29:15,22
**final**
58:1
**financial**
42:17,22
**financing**
24:14,17,25 25:5,11 42:18
42:25
**finding**
24:5
**fine**
9:25 34:3 40:9 46:6,18
52:22
**finra**
18:22

[firm - hour]

**firm**
19:7,11,12
**first**
5:19 6:9 7:8 18:9 26:23 41:13 53:14 54:17 56:18 60:5 64:1
**five**
7:16 18:11 19:5 20:5 23:18 26:4 27:17 45:24 48:15
**fixed**
7:21
**fl**
1:4 68:5
**florida**
1:11 2:11 68:7
**focused**
24:4
**focusing**
24:1
**follow**
10:3
**follows**
5:20
**foregoing**
68:10 69:4,9
**forever**
49:10
**forgot**
19:14
**form**
3:8 8:2 24:8 66:10,20
**formal**
6:14
**formalities**
36:21
**forming**
24:10
**forms**
57:14
**forth**
4:10
**forums**
21:9,9
**full**
6:6 19:23
**fully**
9:4
**fund**
18:20,23 19:9 44:12
**funding**
24:2,5,8
**funds**
44:6 54:1 65:12
**further**
9:24 11:12 67:11 69:8

**future**
37:9 40:23 67:15
**futures**
18:24 20:9,11

**g**

**gao**
64:10 65:4
**general**
56:2
**generate**
24:2
**getting**
47:6
**give**
8:25 9:20 10:1,2 11:2 30:7 58:23
**global**
20:9,11
**gmail.com.**
17:3
**go**
8:24 9:13,16,16 13:19 14:3 18:13 26:4,7 27:7 42:4 46:1 46:2,7
**goes**
24:23
**going**
6:15,21 7:5 8:2,14,24 9:1,2 9:4 10:24 12:20,24,24,25 16:12 22:9,15 25:6,12 27:14,17 28:14,17 30:4,5,7 30:8,24 31:14,15 34:4,12 34:20,25 36:1 37:17,21 39:2 43:8 44:13 46:7 48:2 48:22 49:2,7 52:2 54:8 59:3 66:3,4
**gonzalez**
69:3
**good**
7:7 21:11 27:4 38:12,13 41:25 44:3 45:23
**gotcha**
5:6 7:1 14:24 21:3 23:2 37:11
**grand**
41:23,25 42:8,14 44:25
**granting**
11:6
**great**
5:16 6:13
**ground**
9:1
**grounds**
11:10
**group**
17:10

**guarantee**
29:9 32:6,7,10,11
**guaranteed**
32:16
**guarantees**
29:22
**guess**
35:12
**guidelines**
4:5
**guys**
10:4 59:2

**h**

**half**
22:6 46:13 62:4,6
**halfhill**
2:17
**hand**
5:9
**handing**
4:16
**hands**
9:22
**hao**
1:7 3:4 4:3,15,20,25 5:4,5 5:11,15,18 6:10 7:7,24 8:11 10:18,24 11:1 14:5,16 20:13 22:9,13,15,18 23:22 25:6,12,17,20,23 26:12 27:10 41:4 46:4,25 58:3 65:10,14 66:16 67:11 68:4
**hao's**
26:23
**happy**
33:24
**head**
9:21
**heads**
40:16
**health**
4:6
**hear**
5:3,14 7:18,19 13:1 36:25 48:13 49:5 54:20
**hearing**
1:14
**hedge**
18:20,23 19:8
**held**
17:25 18:16,18 69:5
**helped**
7:23
**herndon**
14:19
**high**
17:8,10,11

**highest**
24:23
**highlighted**
29:4,6,8 32:3,5 35:1,9,13 38:6 41:14,19 43:24,25 44:3,21 49:4,8 50:14 53:14 53:22 54:2,12,18 56:1,16 57:19,20 58:2 60:4,5 61:23 64:1
**highlighting**
35:23
**hills**
2:18
**history**
17:8
**hk**
55:10
**hold**
17:24 18:1 30:15
**holdings**
61:24 62:8
**home**
15:2
**homes**
20:18,19
**hong**
49:20 55:10 64:11 65:4
**hongzhishengy**
55:11
**hopefully**
59:1
**hopker**
2:4 4:2,16 5:1,6,12,16,21 5:21 6:11,13,21 7:1,5,24 8:5,11,14,17,21 10:8,12,17 11:1,19 14:5,14,15,24,25 22:11,12,17 25:8,9,14 26:6 26:11,15,19,25 27:4,6,9,16 27:21,22 28:14,20 30:4,12 30:16 31:1,4,14,18 33:2,6 34:4,8,12,16 36:4,5 37:16 37:18,21,25 39:2,8,12,14 39:22 40:18,22 41:2,3,8 42:5 43:8,12,16 45:22,25 46:11,16,20,23 47:4,5 48:2 48:4,22 49:1 52:1,4,7,11,23 53:2 58:23 59:4 62:18 63:1 63:4,7,11 65:14,20,23 66:2 66:6,9,18,25 67:4,11
**hosted**
15:18
**hotmail.com.**
17:4
**hour**
46:12

**[hours - long]**

**hours**
46:12
**hover**
40:15

**i**

**i'm**
35:21
**idea**
41:25 66:5
**identification**
28:19 30:11 31:3,17 34:15
37:24 39:7 43:15 48:25
52:10 62:25 63:10
**identified**
3:7
**images**
4:23
**immediately**
54:6
**immunity**
11:6
**improper**
36:3
**in2014**
19:15
**inactive**
16:1 18:6,13 19:6
**incentive**
35:6,8,19 45:7,10
**incentives**
37:13
**including**
7:17
**income**
22:14 44:19,20
**incriminate**
11:10 14:11
**incrimination**
11:4,15
**indicated**
69:5
**individually**
49:9
**infer**
14:10
**inference**
14:8
**influence**
10:9
**inform**
58:19 64:24
**information**
8:1 9:24 32:12 55:12
**insisted**
44:14

**instructed**
25:23
**intention**
11:4
**interest**
24:19,24 36:7,11 38:14
42:24 44:7,12 47:9,12,18
47:20,22,24,25 50:4,7,15
50:18 51:13 53:20 57:14
64:21
**interests**
37:3
**international**
55:9,12,13,14 60:17 62:4
64:11,17
**invested**
55:17 57:9 61:9
**investigation**
4:21 5:24 6:3 67:14
**investigative**
68:13
**investment**
19:10,10,19 36:17 37:5
47:11,15 49:17,20 62:11
65:1,2
**investments**
29:16,19,23 32:15 36:14
49:15 50:5 59:25 63:19,20
64:3
**investor**
3:14 32:7 34:22 49:14,21
50:8,19 51:3,14 53:16 54:5
54:23 55:17 56:22,23 57:4
57:8,16,23 58:4,20 61:3
62:1,8 64:5,17,24
**investors**
31:11 32:13,15,23 34:18
35:14 36:10 38:13,20 41:21
44:23 45:14 47:14,17,21
50:2,5,16,25 51:13,14 57:3
57:4,15 58:20 61:7,8 62:1
63:24 65:12
**invoke**
10:24 22:9,15 25:6,12
**invokes**
25:17
**involved**
29:12
**irs**
57:8

**j**

**j&h**
64:3
**jack**
20:18

**jag**
19:18
**james**
2:16
**january**
1:12 4:3 26:12 46:24 67:17
68:6 69:6
**jason**
2:6 5:22 26:20 46:25
**jia**
60:12
**jim**
5:5 7:7
**job**
20:15 21:6
**joint**
32:11
**judge**
14:7,10
**july**
21:14 38:4,8 43:21
**jump**
49:2
**june**
20:1 41:10 42:16,22,25
**jury**
14:7,10
**jvm**
20:18

**k**

**keep**
32:22 36:21
**keeping**
36:22
**kind**
24:19
**know**
7:18 8:8 9:14 13:9 15:25
16:2 33:3,21 39:15,23 40:6
40:24 41:22 42:2 52:23
63:7 66:13,15,16
**known**
44:13
**kong**
49:20

**l**

**land**
25:2
**language**
26:23
**late**
16:9
**laws**
6:2,5

**leave**
19:24
**left**
19:7 20:1 35:5 56:22
**legal**
22:4 32:4,6
**lender**
24:11 41:16
**lenders**
42:19
**leping**
60:12
**letters**
14:23
**li**
53:15
**license**
18:1,2,8,10,11,16,17,19,22
19:4,13,15,20,23
**licenses**
17:25 18:18,18
**limited**
61:24
**line**
40:10 47:6
**list**
15:1,7 16:19
**literal**
26:23
**literally**
46:12
**little**
7:13,22 37:8 39:10 40:5
46:5 52:19 53:1 54:12,14
65:24
**llc**
1:5 5:25 21:20,21,25 23:23
23:25 27:11 29:1 36:8 47:8
48:13 49:15,21 50:2,5,16
52:15 53:4,16,20 56:12
59:9,14,17,24 61:15 62:14
63:14,16,18 64:22 68:3
69:7
**llc's**
48:19 51:17
**loan**
24:10,13
**locate**
21:11
**located**
20:23,24 21:1
**location**
68:7
**long**
19:3 21:12 22:23 23:17
46:7

**[longer - okay]**

**longer**
46:5
**look**
5:7 6:16 7:2 8:7 25:1,2,3
28:23 29:18 39:25 40:23
66:17
**looked**
42:9 45:6
**looking**
21:8,8 39:20
**lost**
20:15
**lot**
42:1
**loudly**
7:19,22

**m**

**m.b.a.**
17:23
**mahdavi**
2:17
**making**
9:21 21:17 47:12,15,18
**manage**
36:14
**management**
35:3,6,7,8,10,11,14,16
37:12 45:7,10
**mark**
28:17 30:24 31:15 37:21
48:22
**marked**
8:3,14 28:18 30:9,10 31:2
31:16 34:14 37:23 39:6
43:12,14,17 48:24 52:9
62:19,24 63:9,12
**marketing**
44:4,9 45:11,14
**marking**
31:6 34:13 39:4 52:7 62:23
63:8
**married**
22:18,20,23
**mary**
19:18 20:19
**maryland**
17:14,20
**master**
17:13
**master's**
17:16,21
**materials**
3:12,13 4:21 31:11,21
32:23
**matter**
1:3,14 5:25 68:3 69:6

**matters**
68:12
**mature**
32:8
**mean**
46:15
**means**
14:9
**meant**
27:5,6 46:2
**medication**
10:9
**member**
23:2,5,8,12,17,20
**membership**
23:10 36:7,11 37:3
**memberships**
63:23
**mental**
10:12
**mentioned**
38:8,24 41:20 45:1 50:9,19
51:5 61:3
**merely**
11:9
**metronomic**
29:23
**metronomics**
29:16,19,20 38:9,15,19
42:16,21,24 44:22 45:4,12
47:8,12,14,17,21,25 53:19
59:25 64:20
**mezz**
41:15
**mezzanine**
24:10,13,15,17,25 25:5,11
42:18,25
**miami**
1:11 2:11 41:21,24 42:2
68:7
**microphone**
7:12,15
**mid**
16:11,16
**middle**
16:9
**million**
38:11,14,17,23 60:8,19,24
61:2,4,25 62:5,6
**minus**
22:24
**minute**
26:4 39:10 45:24 46:17
**minutes**
36:22 59:2

**misspellings**
66:13,16
**moment**
7:1 44:19,20
**momentarily**
14:21
**money**
47:11,24 50:7,19 51:2,3,14
54:6 56:22,23 57:4,8,23
58:4,11,21 61:8 62:9 64:16
**monitor**
29:18
**monitoring**
29:13,22
**month**
21:17
**months**
17:14
**morning**
7:7
**mortgage**
58:3,4,20
**multifamily**
24:3
**muxuan**
64:10 65:4

**n**

**name**
6:6,7,9,10 14:18 19:11
55:10 68:17
**names**
23:11
**national**
4:6 18:24
**nearest**
33:21
**necessary**
10:4 67:14
**need**
4:19 6:19 9:12 11:9 26:24
52:21 58:25 63:7
**needed**
6:22
**needs**
11:23
**network**
34:6
**new**
44:19 51:14
**nfa**
18:24
**nodding**
9:21
**normal**
66:4

**normally**
24:9 44:12
**northern**
23:8,9,14
**notation**
56:19 58:3
**note**
35:24 37:12 42:10
**notice**
1:15 8:2
**november**
52:14 56:7,12,13,17,18
57:2,22 58:2,15 59:14
60:11 61:20 63:14
**number**
15:5 21:7
**numbers**
15:2

**o**

**oath**
4:12 14:1 26:2
**object**
36:1
**objection**
25:19 35:24
**objections**
25:24
**obtain**
18:7
**obviously**
10:19
**october**
53:15,23 54:3,18 55:8
56:24 57:5,9,16,24 58:5,9
58:15
**offer**
27:7,13 28:1 35:10 63:23
**offered**
31:11 36:10
**offering**
3:12,13 27:23 31:10,21
32:23 35:15,19 49:22 53:17
54:23 62:1,9
**offerings**
32:13 34:17 36:11 50:2,5
**office**
33:21 34:1
**officers**
5:22
**oh**
27:19 43:3 49:6
**okay**
4:16 5:1,6,9,12,16 6:13 7:5
7:24 8:11,21 10:8,12 11:1
12:4 14:5,14,24 15:7,15,22
15:25 16:5,9,15,19 17:2,5,7

[okay - projects]

**okay (cont.)**
17:19,24 18:3,7,13,15,22
18:25 19:3,6,8,16,22 20:2,7
20:10,16,20,22 21:3,6,15
21:18,21,24 22:4,7,11,20
22:23,25 23:5,12,16,19,22
24:4,8,13,19 25:8 26:1,6,25
27:4,16,19,21 28:1,11,14
28:16 29:8 30:4,5,8,15,17
30:21 31:1,10,14,21,25
32:3,12 34:4,9,12,17,20,25
35:4,7,12,21 36:4 37:2,11
37:16,16,21 38:3,6 39:2,3
39:13 40:22 41:2,13 42:13
43:4,8,9 44:3 45:22 46:14
46:16,20,21,23 47:4,6 48:5
48:18 49:6,7 50:12,23 51:7
51:12,16 52:2,7,12,19 53:1
53:3,13 54:1,8,17,22,22,25
55:21,25 56:4,6,15 57:22
58:14,23 59:5,8 60:10
61:11,14,22 62:18 63:1,1,5
63:7 65:10 66:8,23,25 67:9
67:11

**old**
6:12 51:13

**once**
66:21

**open**
34:6

**opening**
7:25

**opportunity**
8:7 10:1,2 33:11

**opposed**
9:21

**option**
33:20

**options**
13:22

**order**
6:14 66:10,10,20,20

**organization**
23:13,17,20

**organizations**
23:3,6

**originally**
20:3 58:10

**originated**
49:20

**overseas**
55:18 61:9 62:10 64:14
65:1

**owed**
44:9

**owned**
32:20

**p**

**package**
3:14 25:1

**page**
9:11 29:1,1,3 34:21,25 35:1
35:9,22,23 36:6 49:2 50:12
54:8,9,13 55:25 56:2 57:18
61:11,12

**pages**
1:8 28:25

**paid**
38:17 44:8 57:15

**paper**
4:17

**paragraph**
41:13,18 43:25

**paralegal**
34:1 67:7

**park**
17:15

**part**
48:11

**paul**
2:4 5:21 11:21 14:3 26:4
33:9 40:4,16 46:9

**pay**
23:9 44:10,11 45:4,15
51:13 56:23 57:3,8,22 58:4
58:20

**paying**
42:24 47:8,21,25 53:20
64:21

**payment**
38:19 57:14

**payments**
44:8 47:9,12,15,18,20,24
47:25 50:4,8,16,19,25 51:3
53:20 57:14 64:21

**payroll**
56:19,23

**peeled**
44:16

**people**
16:12 21:9 36:1

**percent**
24:22,23 32:7,9 35:3,8

**period**
58:8 62:22

**permit**
12:22

**permitted**
14:10 33:15,20

**person**
4:4,7,8,14 33:12,22

**personal**
16:22

**personally**
38:11

**peter**
19:18

**phone**
15:2,2,4,5

**photograph**
4:22

**photos**
33:15,20

**physical**
10:13

**pictures**
33:13

**pjm**
19:12,16,24 20:2,10

**place**
1:9 29:23

**plaza**
41:24 42:1,8,14 44:25

**please**
4:18 5:6,10 6:6,8 8:6 9:3,6
9:13,14,20 10:20 12:14
13:15 14:2 15:1,7 16:19
23:23 26:14 29:5 35:2,9
39:11 42:3,3 47:16 52:18
53:25

**pledges**
29:10

**pllc**
2:17

**plus**
13:6

**point**
53:13

**pointed**
41:9

**points**
7:8

**portfolio**
44:19

**portion**
32:4,5 35:1 38:6 41:19
43:24 44:1,4,21

**portions**
29:6 35:9,13

**posed**
14:1

**position**
24:9 41:16

**possible**
7:20 9:4 67:15

**practice**
13:2

**practicing**
13:3

**pre**
8:14

**preferred**
41:16 42:19

**prepared**
69:9

**present**
5:3

**preserve**
4:23

**preserved**
27:8

**president**
21:5,20 22:7

**press**
34:4

**prevent**
10:10

**previous**
9:25 20:16 42:10 45:1 50:4
50:16,25 54:2 56:21 57:2
57:14

**previously**
4:11 6:13 8:5

**principal**
32:6

**prior**
7:25 20:17 21:18 32:8,16
32:20

**privilege**
11:3,8,14,22 12:6,16 14:7
28:9 30:2 32:25 37:6,14
38:25 43:6 45:20 51:10
58:17 62:16 65:8

**problem**
7:16 13:8

**problems**
42:17,22

**proceed**
9:1

**proceeding**
5:23 69:8

**proceedings**
68:13

**professional**
17:25 18:15,18 23:3,6,13

**programs**
24:3

**project**
32:8,10,20 42:1,8,9,14
44:25

**projects**
25:10 32:16 38:14 41:21

**[promissory - right]**

**promissory**
37:12 42:10
**pronunciation**
60:13
**proofreader's**
68:1,17
**property**
4:21 60:1 63:21
**prosecution**
11:6
**provide**
4:4 24:13,17 25:5,10,21
33:6 67:2
**provided**
4:11 6:14 7:25 8:6,21 32:13
33:10 42:25 48:11,15 52:13
56:10 59:12 61:18 63:13
**provides**
28:8
**provisions**
6:1
**purpose**
24:11,16 36:12,20 37:4
59:24 63:18,24 64:6 65:11
**purposes**
5:23
**pursuant**
1:15 4:5 8:12,19 52:13
56:11 59:13 61:19 63:13
**put**
6:15,19 8:2 55:5
**putting**
44:18

**q**

**qd**
29:12
**qdd**
63:16,18,24 64:6 65:7
**qde**
36:7
**qdef**
59:9,17,24 61:15 62:14,21
**qidian**
1:5 5:25 21:20,21,24 22:8
23:23,25 24:10 25:4,15
27:11,12,13,24 28:2,5,8,12
29:1,15,18 31:11 32:23
34:18 35:15,19 36:10,14,18
36:20 37:5 38:20 41:20
42:25 47:8,21 48:12,19
49:14,21 50:2,5,16,25
51:17 52:15 53:4,16,20
54:23 56:12,19,23 57:3,3,8
57:9,15,23 59:14,25 61:20
62:1,9 63:14,19 64:5,22
65:11 68:3 69:7

**qidiancapitals.com.**
15:11
**qidian's**
15:10 32:13 58:16
**question**
7:12 9:2,6,9 10:25 11:7,13
11:20 13:20 14:1,2,6 27:1
35:13 40:21 41:9 51:12
58:19 59:19
**questioning**
47:6
**questionnaire**
8:22,23
**questions**
8:7,9,24 9:3 10:3,3,5 11:12
11:16 12:13,14 13:24 14:11
27:12 28:7 29:25 32:22
35:25 37:3 38:22 43:5
45:18 51:8 52:24 58:14,25
62:13 65:6,15,21 67:12
**queued**
43:9
**quiet**
37:8

**r**

**raise**
5:9 41:24 44:15
**raised**
38:9
**raising**
44:5,14
**random**
2:18
**rate**
24:24
**rates**
24:19
**read**
29:5 32:4 35:1,23,25 36:2
66:1
**reading**
36:1 49:9
**ready**
46:23 52:24
**real**
18:1,1,7,9,17 20:21,22
21:10 23:7,8,12,13 26:24
64:20
**realized**
62:19
**really**
16:17
**reason**
10:13
**recapitalization**
41:15

**recapitalize**
42:18
**received**
8:23 17:9 38:11 40:18
**receiving**
33:4
**recess**
26:10 46:22
**recognize**
9:14 48:9
**record**
4:2 6:7 7:25 9:8,16,16,17
9:19,23 25:3,20 26:5,6,7,11
26:13,16,21 27:3,7,8,8,10
45:25 46:1,21,24 47:2,7
65:17,23 66:6 67:16
**recorded**
68:12 69:8
**records**
48:12
**reduce**
41:20
**reduced**
55:22 56:20
**referred**
8:4,16
**refinance**
44:18
**refuse**
11:9,20 14:6
**regard**
13:22
**regarding**
44:4
**regional**
24:1,7
**registered**
19:19
**related**
44:25 59:1
**remain**
10:25 22:10,16 25:7,13
**remember**
16:7,10,17 23:9,10,16,19
23:21 56:21 58:9
**remotely**
4:13
**rephrase**
9:10
**replace**
41:15 42:18
**reporter**
9:4,7,15,22 66:14 69:3
**reporter's**
69:1

**reporting**
1:24 29:13
**reports**
29:19
**represent**
12:13
**request**
9:15
**requesting**
33:11
**reshare**
62:19
**resharing**
62:20
**reside**
14:17
**resource**
24:2
**resources**
21:8,11
**respectively**
61:5
**respond**
13:5,7
**responded**
13:7
**responding**
12:18
**response**
12:19
**responses**
13:23 25:20
**restrictions**
4:5
**restructure**
42:13
**resulting**
55:3 58:7
**return**
32:7,9
**returned**
44:16
**review**
4:19 33:11,18,19,22 66:21
66:22,24
**reviewed**
7:3
**ria**
19:13,14,14
**ricky**
38:3,7 41:10 43:20
**right**
5:9 6:15,16 10:25 11:25
12:23 13:11,19 18:6 22:5
22:10,16 25:7,13,18 27:14
40:5,13,19 43:13 46:18

[right - substantial]

**right (cont.)**
48:6 55:1,2 65:22 66:18
**rights**
13:16
**road**
2:18 14:18,20
**role**
13:13
**room**
5:2
**round**
46:19
**routine**
4:9
**rule**
13:9
**rules**
9:1 12:8
**running**
42:17 55:3,21 58:9

**s**

**salary**
21:15
**saw**
45:1
**saying**
13:1 40:3 55:2 66:19
**says**
13:10 29:4 32:4 35:7 40:6
40:15 44:4 45:11 55:9,12
58:3
**schedule**
33:25 67:6,15
**school**
17:8,10,11,17
**screen**
4:18,19 5:8 6:15,20 7:9 8:3
8:17 28:16 40:5,6,15 48:6
**screenshot**
4:22
**scroll**
34:20 39:10,16,17,20,21,24
39:25 40:2,24,25 42:3
52:17,18,20,21,25 53:25
54:11,14 55:1 63:8
**scrolled**
39:12 50:12 57:18
**scrolling**
39:15 43:23
**sec**
3:8 8:4,16 12:22 13:3,4,8
14:9 28:18 30:10 31:2,16
33:21 34:14 37:23 39:6
43:14 48:24 52:9 62:24
63:9

**second**
21:10 26:1 30:5,8 35:21
41:18 43:2 52:1 58:23
**section**
29:4
**sections**
29:8
**secure**
16:13
**secured**
32:8
**securities**
1:1,9 2:3,8 5:24 6:2
**security**
29:10
**seen**
40:20
**self**
11:3,15
**send**
33:20 44:6 55:18 60:24
61:8 62:9 64:25 66:9,19
**senior**
2:5
**sent**
38:3 52:14 55:9,13 56:11
57:9 59:13 61:19 64:14
**separate**
36:22
**separately**
33:3
**september**
48:20 49:11,19,25,25 50:1
50:9,9,21,24 51:4,8
**series**
9:2 18:21,25 19:4 30:7 48:3
49:24 56:1,16 58:25
**service**
3:11 15:18 16:12 30:18
**services**
1:24 27:12,23 28:1,8 30:22
**set**
4:9 33:17 34:2 50:13
**sexy**
42:1
**share**
4:24 8:14 37:17 39:2 52:2
59:3
**shared**
34:9 59:5
**sharing**
7:6 30:4
**show**
4:10,20 5:8 11:13 28:14
30:6,8,23 31:14 40:23 43:8
48:2 58:25 63:2

**showed**
31:22 39:19
**showing**
4:17 34:5
**sign**
9:21 66:4,7
**signature**
34:21,22
**silent**
10:25 22:10,16 25:7,13
**simply**
44:6,17 55:11
**sir**
6:11,17 7:2 8:25 12:6 13:1
13:12,21 15:5,16 16:1,25
18:3 21:13 28:21 30:6,13
31:19 34:5,10,23 37:17
38:1 39:3,9 43:18 44:1 48:3
49:4 51:7 52:3 54:9 57:20
58:24 59:6 60:8 61:12 63:3
63:5
**sites**
16:3
**six**
18:12 20:5 23:18
**small**
24:3,4,5 52:20
**sonia**
69:3
**sorry**
5:3,14 11:21 14:20 20:25
31:8 35:21 36:25 43:2
44:20 45:17 48:13 49:4,18
52:17 54:20 55:10 56:13
60:5,11,13,22 62:18 63:20
**sound**
26:8
**source**
50:7 51:2 54:1 61:2 64:16
**space**
41:22
**speak**
37:9
**speaking**
7:22
**speaks**
36:2
**special**
24:11,16 36:12,20 37:4
59:24 63:18,24 64:6 65:11
**specialized**
20:10
**specifically**
29:4
**speech**
7:14

**spell**
6:6 15:12
**spelled**
6:10
**spoke**
28:11
**spv**
24:11
**spvs**
36:15,15
**squiggly**
40:10
**staff**
9:14 67:7
**stands**
19:14,14
**start**
9:7 27:23 41:25
**started**
21:14 23:25
**starting**
17:8
**startup**
23:25
**state**
6:4,6,7 11:9 14:19 18:3
**statement**
3:18,19,20,21 45:9 48:7,11
48:18 51:8 52:12 56:8,10
56:21 59:9,12 61:15,18
63:13
**statements**
58:15 62:23 63:15
**states**
1:1 5:24
**stop**
7:5 30:4 47:8
**stopped**
47:21
**structure**
41:23
**study**
17:15
**studying**
17:12
**subpoena**
3:9 8:12,18 52:13 56:11
59:13 61:19 63:14
**subpoenaed**
4:3 48:12
**subscription**
36:6 45:6
**substance**
9:17 10:9 26:13,16 47:1
**substantial**
38:9

**[successful - victor]**

**successful**
16:4 32:8,20
**summarize**
17:7 49:8
**summarized**
9:18
**supplement**
9:25
**supplemental**
8:1
**support**
30:21 67:7
**supreme**
12:10,11
**sure**
9:10 33:25 45:25 60:13
67:6
**swear**
5:12
**sworn**
4:4,7 5:20 12:16 13:12
**system**
20:3

**t**

**taken**
26:10 46:22
**talk**
7:19 21:9 27:2
**talking**
9:8
**taxes**
57:8
**tdncapital.com.**
16:22
**technical**
7:8
**technology**
20:4
**telephonic**
4:7
**tell**
4:13 5:13 13:3 15:12 23:23
32:15 35:14 38:1 41:4
51:13 52:20 54:5 55:17
61:7 62:8 65:11 67:5
**telling**
13:14
**temple**
17:12
**ten**
65:2
**terrible**
60:13
**testified**
5:20

**testify**
10:14 67:13
**testifying**
10:10
**testimonies**
13:4
**testimony**
4:4,7,7,8 5:7 9:1,24 10:1,19
10:22 11:2,6 65:23 66:2,7
66:11 67:16 68:13 69:5
**text**
35:4 38:8
**thank**
7:23 14:24 17:7 27:4 33:2
37:16 41:1 42:4 43:4 44:3
45:22 46:21 47:4 51:7
54:22 57:18 62:18 67:10
**thanks**
46:14 52:25
**thing**
9:5 67:1
**think**
7:3 8:20 13:25 15:17,17,17
18:6,11,14,21,25 19:1,13
23:7 26:2 37:9,20 40:20
46:9 66:12
**thousand**
12:21
**three**
17:13 18:10 19:5 22:14
23:6 25:20 49:8 57:12
**time**
4:18 9:12 12:21,22 13:15
13:15 16:2 26:1 27:7 32:10
33:17 36:18 39:24 40:9,20
40:22 42:16 45:23 58:8
59:19 65:15 67:12
**times**
7:13 12:21
**title**
21:4
**today**
4:24 10:10,14,19,22 46:8
65:18
**told**
44:9 45:14
**top**
7:10 35:22 36:6 39:12 40:5
56:3
**tops**
46:13
**total**
55:21
**touched**
23:22

**tough**
39:19
**track**
25:3
**trader**
20:5
**trading**
20:6,7,9,11
**trained**
20:4
**transaction**
53:15 55:8,14 58:1 60:6,10
64:2
**transactions**
49:3,8,24 50:13,23 51:24
53:11,14 54:13 56:1,16
57:1,12,19,20 58:12 59:21
60:4 61:23
**transcript**
4:8,9 33:7 68:11 69:4,5,9
**transcription**
68:12
**transfer**
55:15 60:7 62:4 64:11
**transferred**
17:14
**translate**
30:18
**translated**
3:13 31:22 32:1
**translation**
3:11 30:17,22
**travel**
4:5
**tried**
16:5
**trinidad**
38:4,7 41:10,14 42:6 43:20
**true**
32:19 68:11 69:4
**truth**
4:13 5:13,13,14
**truthful**
11:13
**truthfully**
10:10
**try**
7:19 9:3 40:16
**trying**
16:3 39:17,21 44:11 46:6
**tuesday**
1:12 68:6
**turn**
29:3
**tyson's**
21:2

**u**

**ucc**
29:10,15
**unable**
42:4
**unclear**
7:13
**undersigned**
68:10
**understand**
4:24 11:17 12:24 14:12
26:22,25 27:1 30:24
**understanding**
11:8 44:7 46:7
**understands**
11:18
**understood**
12:15
**unfortunately**
33:14 39:20,22
**unit**
37:3 63:23
**united**
1:1 5:24
**units**
36:7,11
**university**
17:12,14,17,20,22
**upfront**
44:12
**use**
27:14 51:20 53:7 59:18
65:12
**user**
51:17 53:4
**uses**
4:9

**v**

**value**
25:2
**various**
16:20 36:11 50:2
**vehicle**
24:11 59:24 63:18,24 64:6
**vehicles**
24:16 36:12,20 37:4 65:12
**verbal**
9:20
**version**
15:19,20,22
**vice**
21:5
**victor**
20:19

[vienna - zoom]

**vienna**
20:24 21:2,2,3
**violations**
6:1,4
**virginia**
2:19 14:19 17:17,22 18:4
20:24,25 23:8,9,14
**visibility**
42:2
**voluntarily**
11:16

**w**

**wait**
39:10 66:23
**waived**
35:10
**walla**
60:12
**walls**
7:15
**want**
6:16 7:1 8:6,25 9:24 33:3
39:23,24 40:9 52:17 66:9
**wanting**
42:17
**washington**
60:7
**waste**
40:9
**wasted**
40:20
**water**
9:13
**ways**
33:16
**web**
15:18 16:11 28:25 29:1
**webex**
1:15 4:8,13,18 5:8 33:18,23
67:3
**webpage**
3:10
**website**
15:10,10,13,15 28:11,12
30:1
**websites**
15:7,25
**weeks**
33:24
**wenhui**
60:19,22 61:9 62:5,10
**went**
16:1 27:10 47:7 49:25
58:12
**we've**
4:6 7:16 13:5 26:2 40:20

**wire**
55:9,12,13,15 60:6,18 62:4
64:11
**wires**
64:8,14,17
**wish**
11:8,14 65:16,20
**withdraw**
54:6
**withdrawal**
53:22,23 54:2 55:22 56:18
57:7 62:6
**withdrawals**
56:17 57:2
**witness**
1:7 2:15 3:3 5:19 6:9,12,18
6:25 8:13,20 10:7,11,15
11:23 12:5,7,17,18 13:5,7,8
13:18 14:13 25:25 26:14
27:2,5,19 47:3 52:25 65:19
68:4
**witness's**
11:22 12:2,16,23
**words**
11:11
**work**
21:12 34:1 38:12,15 39:23
67:5,6
**worked**
18:23 19:8,17
**working**
18:20 19:11 21:10,19 25:16
**works**
26:9 27:21
**world**
7:17
**worth**
40:19
**wrap**
59:1
**ww.qdcrowd**
15:20
**www.qidiancapitals.com.**
15:14

**x**

**xue**
64:11 65:4

**y**

**yahoo.com.**
16:23
**yeah**
6:25 11:24 15:14 17:24
18:24 19:1,18,23 34:3
39:22 40:4 49:7 52:18
54:15 67:4

**year**
16:8,9,10,11,17 18:14
20:15 22:6
**yearly**
22:13
**years**
6:12 7:16 13:3,6 18:10,11
18:12,21 19:1,5 20:5 22:14
22:24 23:6,18 38:13
**yesterday**
6:20
**young**
2:17
**yup**
48:23

**z**

**zero**
35:3,8,11,15
**zhou**
34:22
**zip**
14:19
**zoom**
7:10,10 52:19